PARRO, J.
lain this nursing malpractice case, the jury returned a verdict in which it assessed fault to a medical equipment manufacturer, a registered nurse, and a patient, and awarded damages to that patient and his wife. On the plaintiffs’ motion, the trial court granted a judgment notwithstanding the verdict (JNOV), finding the registered nurse to be the sole party at fault and increasing the jury’s general damage awards to the plaintiffs. The defendants/appellants, Unique Home Health Care, Inc. and Lynette Gordon, appeal the trial court’s entry of the JNOV. For the *1074 following reasons, we reverse the JNOV and reinstate the jury’s verdict, together with the June 18, 2012 judgment, which was rendered in accordance with the jury’s verdict.
FACTUAL AND PROCEDURAL BACKGROUND
In April 1994, forty-nine-year-old Abel J. Granger, Jr. underwent heart transplant surgery at Ochsner Hospital (Ochsner) in New Orleans, Louisiana. As a result of anti-rejection medications he was subsequently required to take, Mr. Granger developed chronic pain due to neuropathy. In November 2004, Mr. Granger had an intrathecal pump (pain pump), manufactured by Medtronic, Inc. (Medtronic), implanted in his abdominal cavity upon the recommendation of Dr. Shawn Dunn, a neurologist and pain specialist at the Neu-roMedical Center (NMC) in Baton Rouge, Louisiana. The purpose of the pain pump was to dispense regular doses of morphine to Mr. Granger for his chronic pain. For several years, approximately once every two months, Dr. Dunn sent Mr. Granger to various medical facilities to have his pain pump refilled with morphine.
In 2009, a NMC nurse asked a representative of Unique Home Health Care, Inc. (Unique) if Unique would be interested in having its employees trained to fill pain pumps. As a result of this conversation, Mr. Bryan McDaniel, a Medtronic clinical specialist, went to Unique’s office and conducted a training session for Unique’s employees. Mr. McDaniel also accompanied Unique nurses on at least two to three visits to the homes of patients with pain pumps to guide the Unique nurses through the actual refill process. Mrs. Lynette Gordon, a registered nurse and the owner/CEO of Unique (Nurse Gordon), was one of the Unique employees Mr. McDaniel trained on the Rpain pump refill procedure.
Beginning in approximately December 2009, Nurse Gordon began regular visits to Mr. Granger’s home in Plaquemine, Louisiana, to refill his pain pump with morphine. By mid-June 2010, she had refilled Mr. Granger’s pain pump without incident approximately three to four times. During her visits to his home, Nurse Gordon became aware of Mr. Granger’s significant medical history as a heart transplant patient, which included the insertion of multiple stents into his heart, hypertension, dyslipidemia, chronic neuropathy, allograft vasculopathy, and multiple bouts with pneumonia, all of which necessitated repeated hospital visits. She also developed a relationship with Mr. Granger’s wife, Cora, who was Mr. Granger’s primary caretaker.
On June 1, 2010, Mr. Granger, then sixty-five years old, was hospitalized for ten days with pneumonia. He was discharged on June 11, 2010, with a change in anti-rejection medication and, due to his low oxygen levels, with instructions to sleep with oxygen at night. After his return home, Mrs. Granger told Nurse Gordon that Mr. Granger’s transplanted heart (which he had then had for approximately sixteen years) was failing and that he needed a new heart transplant.[2] A few days after this conversation, on June 17, 2010, Nurse Gordon returned to the Gran-gers’ home to refill Mr. Granger’s pain pump. When Nurse Gordon performed the refill procedure, unbeknownst to her, an indeterminate amount of the morphine went into the tissue under Mr. Granger’s *1075 skin where the pain pump was located, an occurrence referred to as a “pocket fill,” rather than into the pain pump itself. Within minutes, Mr. Granger became less responsive, his oxygen level fell, and he was sweating and clammy. Given her knowledge of Mr. Granger’s medical history and his recent release from the hospital, Nurse Gordon attributed Mr. Granger’s symptoms to his heart condition rather than to the overdose of morphine he received.
The course of events that occurred at the Grangers’ home following Mr. Gran-ger’s morphine overdose is disputed. Nurse Gordon contends that she repeatedly 14advised Mrs. Granger that 911 should be called, but Mrs. Granger was undecided, because she knew “it was his heart,” and she did not want Mr. Granger to suffer any longer. Nurse Gordon told Mrs. Granger, “he’s going down,” and suggested they pray to decide what to do. After prayer, at least two telephone conversations with Ochsner transplant nurses, and another telephone conversation with an Ochsner cardiologist, Mrs. Granger ultimately told Nurse Gordon to call 911. Approximately ninety minutes elapsed between the time of Mr. Granger’s morphine overdose and the 911 call.
When an Acadian Ambulance Service (AAS) ambulance arrived, approximately two hours after the overdose, the emergency medical technicians gave Mr. Gran-ger medication to reverse the effects of the morphine overdose. After a discussion between AAS personnel and Mrs. Granger as to the course of action to take, the AAS ambulance transported Mr. Granger to Our Lady of the Lake Regional Medical Center (OLOLRMC) in Baton Rouge, where he remained hospitalized for five days. Although Mr. Granger experienced short term adverse effects, he sustained no permanent physical injuries from the morphine overdose.
On September 1, 2010, Mr. and Mrs. Granger filed a petition for damages against Unique, Nurse Gordon, and Med-tronic, alleging the sole cause of their damages was Nurse Gordon’s fault in improperly injecting the morphine, failing to take immediate action to protect Mr. Granger after the injection, suggesting that he “was dying,” using equipment she knew or should have known was not functioning properly, and/or failing to obtain proper maintenance on the equipment. Alternatively, they alleged the fault of Medtronic, claiming that Medtronic equipment, including the pain pump and its interrogator, was defective and/or improperly maintained and that it failed to properly perform as intended.
Medtronic filed an answer and affirmative defenses to the Grangers’ suit. Unique and Nurse Gordon (sometimes, collectively defendants) filed an answer to the suit and also filed a cross-claim against Medtronic. Eventually, the Grangers voluntarily dismissed their claims against Medtronic. The. defendants’ cross-claim against Medtronic was also dismissed pursuant to Medtronic’s peremptory exception pleading |sthe objection of no cause of action, and the defendants were granted leave to file a motion to file an amended cross-claim. However, the record does not contain an amended cross-claim.
Ultimately, the Grangers’ claims against Unique and Nurse Gordon proceeded to a four-day jury trial. At the end of the Grangers’ case in chief, the defendants moved for a directed verdict as to Mrs. Granger’s “bystander recovery” claim, which the trial court denied. The defendants also moved to amend their answer to assert the comparative fault of Medtronic *1076 and Mr. Granger, which motion the trial court granted.[3]
At the conclusion of trial, the jury returned a verdict, finding Nurse Gordon breached the applicable standard of care in causing the pocket fill; however, the jury found that Nurse Gordon did not breach the applicable standard of care in failing to recognize the signs of morphine overdose, in failing to call 911 immediately when Mr. Granger’s symptoms appeared, or in advising Mrs. Granger that Mr. Granger “was dying.” The jury further found that both Medtronic and Mr. Granger were negligent. The jury found that Medtronic was 97% at fault in causing the Grangers’ damages, Nurse Gordon was 2% at fault, and Mr. Granger was 1% at fault. The jury awarded Mr. Granger $28,423.57 in stipulated past medical expenses and $20,000 in general damages and awarded Mrs. Gran-ger $1,000 in general damages. On June 18, 2012, in conformity with the jury’s verdict and assessment of fault, the trial court signed a judgment against the defendants: in favor of Mr. Granger for $568.47 in past medical expenses and $400 in general damages; and, in favor of Mrs. Gran-ger for $20 in general damages.[4]
The Grangers filed a motion for JNOV, and alternatively a motion for new trial, contending the jury’s verdict was contrary to the law and evidence. The parties submitted memoranda to support their respective positions, and the trial court held a ^hearing on the Grangers’ motion. The Grangers essentially argued that the jury erred in assessing fault to Medtronic and to Mr. Granger, because there was no evidence at trial that Mr. Granger’s pain pump was defective or that Mr. Granger contributed to his injury. They also argued that the amount of the jury’s damage award was inadequate. In opposition, the defendants argued that there was sufficient evidence, in the form of Mr. McDaniel’s testimony and a Medtronic recall regarding inadequate warnings on its pain pump, to show that Medtronic’s training practices were deficient and that Nurse Gordon had not been warned of the risks of pocket fills or on the proper workings of the interrogator that read the pain pump. They also argued that Mr. Granger’s insistence that his mail be retrieved during the pain pump refill process was sufficient evidence to justify the jury’s assessment of 1% of fault to him.
At the conclusion of the hearing, the trial court indicated its intent to grant the JNOV, based on its conclusions that Nurse Gordon was primarily at fault, and because any fault of Medtronic due to the Medtronic recall had not been adequately explained. The trial court noted that Nurse Gordon understood how the pain pump worked, saw the swelling caused by the pocket fill, and should have called 911 immediately. The trial court was uncertain as to whether it would uphold the jury’s allocation of fault against Mr. Granger. The trial court deferred a decision on the amount of damages and requested that the parties brief the issue. The trial court also orally denied the Grangers’ alternative motion for new trial.
*1077 After the submission of briefs, in a judgment signed on December 6, 2012, the trial court assessed Nurse Gordon with 100% of the fault in causing the Grangers’ damages, increased the general damage awards to both Mr. and Mrs. Granger, and rendered judgment against Nurse Gordon and Unique, in solido. The judgment, totaling $98,423.57, included damages: in favor of Mr. Granger for $28,423.57 in stipulated past medical expenses and $50,000 in general damages; and, in favor of Mrs. Granger for $20,000 in general damages.
The defendants appeal from the adverse judgment, contending the trial court erred in: (1) granting the JNOV, and (2) denying their motion for directed verdict as to 17Mrs. Granger’s bystander recovery claim.
DISCUSSION
Judgment Notwithstanding the Verdict
A JNOV is a procedural device authorized by LSA-C.C.P. art. 1811, by which the trial court may correct an erroneous jury verdict by modifying the jury’s finding of fault or damages, or both. Marroy v. Hertzak, 11-0403 (La.App. 1st Cir.9/14/11), 77 So.3d 307, 316. Article 1811 does not set out the criteria to be used when deciding a motion for JNOV. Wood v. Humphries, 11-2161 (La.App. 1st Cir.10/9/12), 103 So.3d 1105, 1109-10, unit denied, 12-2712 (La.2/22/13), 108 So.3d 769. However, the Louisiana Supreme Court has established the standard to be used in reviewing a JNOV, stating:
[A] JNOV is warranted when the facts and inferences point so strongly and overwhelmingly in favor of one party that the trial court believes that reasonable persons could not arrive at a contrary verdict. The motion should be granted only when the evidence points so strongly in favor of the moving party that reasonable persons could not reach different conclusions, not merely when there is a preponderance of evidence for the mover. The motion should be denied if there is evidence opposed to the motion which is of such quality and weight that reasonable and fair-minded persons in the exercise of impartial judgment might reach different conclusions. In making this determination, the trial court should not evaluate the credibility of the witnesses, and all reasonable inferences or factual questions should be resolved in favor of the non-moving party. This rigorous standard is based upon the principle that “[wjhen there is a jury, the jury is the trier of fact.” (Citations omitted).
Joseph v. Broussard Rice Mill, Inc., 00-0628 (La.10/30/00), 772 So.2d 94, 99.
An appellate court, reviewing a trial court’s grant of a JNOV, employs the same criteria used by the trial court in deciding whether to grant the motion. See Smith v. State, Dep’t. of Transp. and Dev., 04-1317 (La.3/11/05), 899 So.2d 516, 525. In other words, the appellate court must determine whether the facts and inferences adduced at trial point so overwhelmingly in favor of the moving party that reasonable persons could not arrive at a contrary finding of fact. Id. If the answer is in the affirmative, then the appellate court must affirm the grant of the JNOV. Id. However, if the appellate court determines that reasonable minds could differ on that finding, then the trial court erred in granting the JNOV, and the jury verdict should be reinstated. Id.
Therefore, our initial inquiry in this case is: did the evidence overwhelmingly support the Grangers’ contention that reasonable jurors could not have apportioned [s97% of fault to Medtronic, 2% of fault to Nurse Gordon, and 1% of fault to Mr. Granger. If so, then the trial court was correct in granting the JNOV, and we *1078 must then conduct a manifest error review of the trial court’s independent apportionment of fault. See Gutierrez v. La. Dep’t. of Transp. and Dev., 11-1774 (La.App. 1st Cir.3/23/12), 92 So.3d 380, 386, writ denied, 12-1237 (La.9/21/12), 98 So.3d 343; Borck v. Register, 11-1172 (La.App. 1st Cir.2/10/12), 2012 WL 584224, at *4 (unpublished), clarified on reh’g on other grds, 11-1172 (La.App. 1st Cir.5/15/12), 2012 WL 3101760. If, however, reasonable jurors in the exercise of impartial judgment could reach the conclusion that Med-tronic, Nurse Gordon, and Mr. Granger were at fault as apportioned, and that reasonable jurors could have awarded $28,423.57 for special damages and $20,000 and $1,000 for general damages to Mr. and Mrs. Granger, respectively, then the trial court erred in granting the JNOV and modifying the jury’s verdict, and the jury’s verdict should be reinstated. Gutierrez, 92 So.3d at 386; Borck, 2012 WL 584224, at *4. We perform our appellate review under the same rigorous standards that governed the trial court’s determination of whether a JNOV was warranted, without evaluating the credibility of witnesses, and resolving all reasonable inferences or factual questions in favor of the non-moving parties, Unique and Nurse Gordon. See Gutierrez, 92 So.3d at 385-86.
In this nursing malpractice case, the Grangers were required to prove by a preponderance of the evidence: (1) the standard of care applicable to Nurse Gordon in her practice as a nurse; (2) Nurse Gordon’s breach of that standard of care; and (3) the causal relationship between that breach and the injuries sustained by Mr. and Mrs. Granger. However, where the defendant claims the comparative fault of another as causing damages to a plaintiff, the defendant bears the burden of showing not only the fault of the other, but the percentage thereof. See Joseph, 772 So.2d at 100; Trinh ex rel. Tran v. Dufrene Boats, Inc., 08-0824 (La.App. 1st Cir.1/22/09), 6 So.3d 830, 844, writs denied, 09-0406 and 09-0411 (La.4/13/09), 5 So.3d 166, cert, denied sub nom., Dufrene Boats, Inc. v. Nga Trinh, 558 U.S. 875, 130 S.Ct. 228, 175 L.Ed.2d 128 (2009); and Bradbury v. Thomas, 98-1678 (La.App. 1st Cir.9/24/99), 757 So.2d 666, 680. |9Thus, in this case, the defendants bore the burden of proving the comparative fault of Med-tronic and Mr. Granger.
We now turn to a review of the evidence to determine whether it “overwhelmingly” supports the Grangers’ contention that the jury could not have reasonably apportioned the majority of the fault in this case to Medtronic, only nominal fault to Nurse Gordon, and one percent fault to Mr. Granger.
Medtronic’s Fault
The record shows that, upon NMC’s referral, Medtronic assumed the task of training Unique’s employees on the proper procedure for filling its pain pumps. Mr. Bryan McDaniel, a Medtronic clinical specialist for five years at the time of trial, testified that his job as an educator for Medtronic included “teach[ing] refills” of Medtronic pain pumps. Mr. McDaniel explained that he conducted the initial training “from scratch” for Unique employees, including Nurse Gordon, at Unique’s office, in a session that lasted one to two hours.
Describing his general training methods, Mr. McDaniel testified that he uses demonstration equipment, including: an actual pain pump; an interrogator that attaches to the pain pump and which is programmed to record the level of medication in the pain pump; needles; and, “fake” skin to teach his students. He explained that the proper method for refilling a patient’s pain pump includes: cleaning the site; interrogating the pain pump to assess *1079 how much “old” medication remains in it; inserting the needle through the patient’s skin and into the pain pump; aspirating whatever old medication is in the pain pump; injecting the prescribed dose of new medication into the pain pump; removing the needle from the pain pump; attaching the interrogator to the pain pump; and programming the interrogator with the amount of new medication that has been injected. Specifically, with regard to the interrogator, Mr. McDaniel explained that the interrogator’s reading only indicates the level of medication that has been programmed into the interrogator by the person filling the pain pump, and the interrogator’s reading does not indicate the actual level of medication that has been injected into the pain pump. When asked if he taught this [ 10principle to Nurse Gordon, Mr. McDaniel stated that he did and that he teaches this to everybody.
Mr. McDaniel also testified that he teaches his students how to verify that the needle is properly inserted into the pain pump by “feeling” the needle’s penetration of the pain pump opening and its contact with the back of the chamber into which the injection is being made. Further, Mr. McDaniel stated that he teaches his students the risk of a “pocket fill,” in which the needle is improperly inserted into the patient’s tissue outside of the pain pump, rather than into the pain pump itself. When a pocket fill occurs, a welt will sometimes, but not always, develop under the patient’s skin, indicating that the medication has been improperly injected. According to Mr. McDaniel, he teaches his students steps to prevent a pocket fill and how to attempt to aspirate improperly injected medication by “pulling it back out.”
During Mr. McDaniel’s cross examination, the defendants introduced a Medtronic news release documenting that, between May 1996 and September 2010, eight deaths and 270 events requiring medical intervention had been reported related to the occurrence of pocket fills. In January 2011, Medtronic sent a letter to healthcare professionals reminding them of the potential for pocket fills to occur during the pain pump refill procedure and including recommendations for avoiding pocket fills. The letter notified healthcare professionals that the Medtronic pain pump and associated refill kit labeling would be updated with the information contained in the January 2011 letter. According to Medtronic, “[ajfter an in-depth review of the causes of pocket fills,” it had determined “that pump labeling could be updated to provide additional information to clinicians on using visual and tactile assessments to attain and maintain the appropriate location of the needle throughout the refill procedure.” The U.S. Food and Drug Administration later classified the corrections being made to the Medtronic product labeling in response to the occurrence of pocket fills (the Medtronic recall) as a “Class I recall,” a “situation in which there is a reasonable probability that the use of, or exposure to, a violative product will cause serious adverse health consequences or death.” During his testimony, Mr. McDaniel indicated that he was familiar with the | nMedtronic recall.
Mr. McDaniel also testified that he accompanied Nurse Gordon on at least two to three visits to the homes of patients with pain pumps to guide her through the actual refill process. He indicated that Nurse Gordon demonstrated that she knew how to properly perform a pain pump refill. On cross examination, Mr. McDaniel acknowledged that Medtronic did not give any type of written examination to assess a student’s understanding of the pain pump refill process, nor did he keep records documenting a student’s successful completion of training.
*1080 Nurse Gordon’s testimony regarding the level of training she received on pain pump refills differed from Mr. McDaniel’s testimony. She did not dispute that Mr. McDaniel trained her and her staff for one to two hours at her office or that he accompanied her to two or three patient homes to observe her fill pain pumps. And, her explanation of the basic training of aspirating the old medication from a pain pump, and refilling it with new medication, was consistent with Mr. McDaniel’s statements. However, Nurse Gordon’s testimony was notably different on two issues. First, Nurse Gordon testified that her Medtronic training solely consisted of instilling medication into and removing medication from the pain pump. This training consisted only of Mr. McDaniel’s verbal instruction, and she received no type of manual from Medtronic. According to Nurse Gordon, Mr. McDaniel told her and other Unique employees that the pain pump refill process was “foolproof’ and that “you couldn’t make an error.” She denied that Medtronic or NMC personnel ever told her and her staff “anything about an overdose or any pocket fills or any side effects from what we were doing.” She stated that she first learned of the risk of pocket fills when she received a notice from Medtronic about the Medtronic recall, which was well after Mr. Granger’s June 17, 2010 overdose. She acknowledged being instructed by Mr. McDaniel to “keep the needle in the pump” during the entire refill process. She also clearly testified that she followed this instruction when she filled Mr. Gran-ger’s pain pump on June 17, 2010, because after inserting the needle into the pain pump and removing the old morphine, she never pulled the needle out of the pain pump until the new morphine had been injected and |12the entire refill procedure was completed.
Secondly, Nurse Gordon testified that she was taught by Mr. McDaniel that the interrogator’s reading indicated the actual level of medication contained in the pain pump, not just what had been programmed into the interrogator. This testimony is contrary to Mr. McDaniel’s explanation at trial that the interrogator’s reading only reflects what is programmed into it by the clinician and does not indicate the actual level of medication contained in the pain pump. With regard to Nurse Gordon’s belief that she had properly refilled Mr. Granger’s pain pump, she explained on direct examination:
When I took Medtronic’s [ijnterrogator and placed it back over Mr. Granger, the read out said twenty c.c.’s of [mjorphine was in the pump. So, according to what I was taught, at that time, that medication was in that pump.
And, on cross examination, Nurse Gordon elaborated:
From what I was taught by a [Medtronic] employee, once we got the interrogator and the reading from it, it said that the medication was inside of the pump and my printout indicated that the medicine was inside of the pump. So, my knowledge was, at that point in time, the medication was inside of the pump because the interrogator printout said that’s what’s in there.
When the above testimony by Nurse Gordon is contrasted with Mr. McDaniel’s testimony, it is apparent that the scope of the pain-pump-refill training Nurse Gordon received was disputed. Although Mr. McDaniel stated that Medtronic training included a discussion of the risk, recognition, and prevention of pocket fills, as well as an explanation regarding the interrogator’s function in “reading” the level of medication in the pain pump, Nurse Gordon plainly denied being taught anything about pocket fills and clearly stated that *1081 she was taught that the interrogator reported the actual level of medication in the pain pump.
Nurse Gordon’s Fault and Mr. Granger’s Fault
A nurse’s duty is to exercise the degree of skill ordinarily employed, under similar circumstances, by members of the nursing profession in good standing in the same community or locality, and to use reasonable care and diligence, along with his or her best judgment, in the application of his or her skill to the case. Simmons v. Christus Schumpert Medical Center, 45,-908 (La.App. 2nd Cir.6/15/11), 71 So.3d 407, 414, writs denied, 11-1591 and 11-1592 (La.10/7/11), 71 So.3d 317 and 318. As earlier noted, the jury concluded that Nurse Gordon breached the applicable standard of care in causing the pocket fill, but did not breach the applicable standard of care in failing to recognize the signs of morphine overdose, in failing to call 911 immediately when Mr. Granger’s symptoms appeared, or in advising Mrs. Gran-ger that Mr. Granger “was dying.” Based on the jury’s above conclusions, and in light of the above discussion regarding Medtronic’s fault, we now review the evidence to determine whether it was of such quality and weight to support the jury’s respective allocations of fault to Medtronic, Nurse Gordon, and Mr. Granger.
Nurse Gordon arrived at the Grangers’ home on June 17, 2010, at approximately 12:40 p.m. Mrs. Granger was not home at the time. When Mr. Granger let Nurse Gordon in, he appeared to be “staggering,” and she directed him to sit in the recliner where she checked his vital signs. Because Mr. Granger’s oxygen level was low, she retrieved his oxygen tank from his bedroom and gave him oxygen. After rechecking his vital signs and seeing that his oxygen level rose, Nurse Gordon laid out the supplies from the Medtronic refill kit and began the pain pump refill process. She cleaned the area of Mr. Granger’s body where the pain pump was implanted and interrogated the pain pump, which indicated that there was 2.9 millimeters of morphine left in the pump. At this point, the Grangers’ mail carrier apparently arrived, blew her horn, and delivered the mail. According to Nurse Gordon, Mr. Granger insisted that the mail be retrieved immediately, and he refused to wait until after his pain pump was refilled.[5] Nurse Gordon then stopped what she was doing, went outside and retrieved the mail, returned inside, and continued the refill process.
| ¶4When asked to explain why she chose to interrupt Mr. Granger’s pain pump refill process to retrieve the mail, Nurse Gordon testified as follows:
[Defense Counsel]: [Y]ou had a choice, at that moment in time, if [you] didn’t get up out of that chair, he’d go get his own mail, choice number one. Choice number two, interrupt the procedure and go get his mail for him.... [I]s that a fair approximation of the two choices you were faced with.... ?
[Nurse Gordon]: Correct.
[Defense Counsel]: Why did you choose the one you chose?
*1082 [Nurse Gordon]: Well, I[had] prepped him and everything was sterile on his site, and you only have one kit when you’re going, and so he wanted to get up and go get the mail. He said it was medicine. So I chose to go get it for him, because I could come back, and he’d still be sterile, because I hadn’t drawn the needles or anything then. So all I had to do was change my gloves, and put on another pair of sterile gloves.
The trial testimony of Mr. Granger and Mrs. Granger regarding the mail incident directly contradicts Nurse Gordon’s testimony. Mr. Granger testified that the mail incident did not occur at all. He stated that he was “wide awake” at the time, and Nurse Gordon’s statement that he wanted the mail retrieved was false. Further, Mrs. Granger testified that it was she who retrieved the mail on the date of the incident.[6]
Notwithstanding the above inconsistency, Nurse Gordon testified that, after retrieving the Grangers’ mail and returning to her task, she inserted the needle through Mr. Granger’s skin, using a Med-tronic template to assist her in locating the opening of the pain pump; felt a “little pop” indicating to her that she had properly inserted the needle; aspirated the old morphine from Mr. Granger’s pain pump; attached the new container of morphine to the needle; and injected the new morphine.[7] She described Mr. Granger’s pain pump refill process as follows:
You take the needle; you put it inside once you put up a little template ... [which has] a little round area. So that’s where you put the needle inland it matches the pump. You put it in, and you feel for, what I call, a little pop. It goes through to the back, and then you’re in. You unclamp the tubing; you pull back. If you get the medication out, you’re in the pocket. I did get the medication out, which was the two point whatever, c.c.’s. I took that and put it aside, and then I took the medicine that Mr. Granger had in his home; I screwed it on[.] ... So you push it in, you pull out to make sure you’re in. You push it in, you pull out. You push it in, you pull out. All the medication went in. So at that point, I disconnected that, and I took all my supplies and I put ‘em to the side.... [0]nce you get all the medication in, you pull that needle out, and then you take everything; you clean the site; you look at the site to observe; to make sure everything is okay.
After the injection, Nurse Gordon testified that everything was “fine.” Although Mr. Granger testified that he looked down and saw that “the pump was swelled,” which he had not seen before, Nurse Gordon denied seeing any “bump” or swelling. In the meantime, at approximately 1:00 p.m., Mrs. Granger returned home and greeted Mr. Granger. Nurse Gordon went into the kitchen, spoke to Mrs. Granger, and, after a few attempts, successfully up *1083 dated the interrogator with the amount of morphine she had injected.
Although Nurse Gordon testified that she properly followed the procedure Med-tronic taught her, it is undisputed that an indeterminate amount of the morphine she injected went into the tissue under Mr. Granger’s skin, rather than into his pain pump. In other words, a pocket fill occurred. Within five minutes, Mr. Granger became less responsive, his oxygen level fell, and he was sweating and clammy. Given her knowledge of Mr. Granger’s medical history as a heart transplant patient, Mrs. Granger’s statement to her only a few days before that his transplanted heart was failing, and his recent release from the hospital, Nurse Gordon attributed Mr. Granger’s symptoms to his heart condition, rather than to the overdose of morphine he received.
As earlier stated, the events that occurred at the Grangers’ home following Mr. Granger’s morphine overdose are highly disputed. According to Nurse Gordon, she took Mr. Granger’s vital signs, gave him oxygen, and told Mrs. Granger that they needed to call 911. Nurse Gordon testified that Mrs. Granger also believed Mr. Granger’s symptoms were attributable to his failing heart, that she became “very frantic,” and that she refused to call 911. According to Nurse Gordon, Mrs. Granger said, “It’s his heart. It’s the same problem that he’s been having, is what the doctors told us to [ 1fiexpect, and I don’t want him to suffer anymore.” Nurse Gordon told Mrs. Granger, “he’s going down,” and thinking it might calm her, suggested they pray to decide what to do. They prayed, and then after a “second,” Mrs. Granger decided she wanted to call the “transplant team.” Mrs. Granger then called Ochsner and gave the telephone to Nurse Gordon to explain Mr. Granger’s condition to the Ochsner nurse. Although the Ochsner nurse advised Nurse Gordon to call 911 to get Mr. Gran-ger to an emergency room, Ochsner records documenting the telephone call indicate that Mrs. Granger refused to call 911 because “he had been through enough,” Nurse Gordon had another telephone conversation with “Cindy,” an Ochsner transplant nurse familiar with the Grangers, who also advised that 911 should be called. Mrs. Granger again refused. Mrs. Gran-ger then decided to call Dr. Hector Ventu-ra, one of Mr. Granger’s attending cardiologists at Ochsner. Nurse Gordon spoke to Dr. Ventura, who also advised that Mr. Granger be taken to the emergency room. After Nurse Gordon explained Mrs. Gran-ger’s indecisiveness to him, Doctor Ventu-ra instructed that Mrs. Granger had to make a decision. Nurse Gordon and Mrs. Granger prayed again, and then Mrs. Granger said it was okay to call 911.
In contrast, Mrs. Granger’s testimony at trial indicates her indecisiveness regarding calling 911 was because Nurse Gordon told her Mr. Granger’s symptoms were because of his heart, that “it was his time,” and that Mrs. Granger needed to call her family. Mrs. Granger testified that, when Nurse Gordon told her “he’s going down,” she did not know what to do, but told Nurse Gordon “he’s been in and out of hospitals so much, ... if it’s ... his heart, then I may just let him die at home.” According to Mrs. Granger, she spoke to “Cindy” on the telephone, told Cindy that Mr. Granger was dying, that she “probably would just let him die at home because he’s been in and out of the hospital and everything so much,” and that Cindy told her “Cora, you cannot do that.” Mrs. Granger denied that Nurse Gordon told her they needed to call 911 immediately upon seeing Mr. Granger’s symptoms or that the passage of time would increase the risk to Mr. Granger. Further, during her testimony, she changed her mind sev *1084 eral times on the issue of whether and when Nurse Gordon called 911.
| ^Notwithstanding the discrepancy over what transpired between the time of Mr. Granger’s overdose and the 911 call, the audio recording of the 911 call indicates that Nurse Gordon’s call was received at 2:29 p.m. She reported to the 911 operator that Mr. Granger was a heart transplant patient, was nonresponsive, and that an ambulance was needed. Mrs. Granger’s distressed voice can be heard in the background, telling Nurse Gordon the street address of the residence. The call was transferred to MS. Nurse Gordon explained that Mr. Granger was a heart transplant patient; had been released from the hospital three days earlier; was nonresponsive; she had given him oxygen; he was breathing, but abnormally; was “like in a coma”; and that she had spoken to the doctor, who wanted him air lifted to Ochsner. Mrs. Granger’s voice can again be heard in the background, telling Nurse Gordon the address and telephone number of the residence and Mr. Granger’s age. After listening to this audio recording of the 911 call during the trial, in which Mrs. Granger’s voice can clearly be heard responding to Nurse Gordon’s questions, Mrs. Granger refused to admit that Nurse Gordon called 911 in her presence.
After the 911 call was made, Tracy Le-Jeune, Mr. Granger’s niece who lived next door to the Grangers, arrived home. As she exited her car, Mrs. Granger called to her from the Grangers’ carport, saying, “[C]ome see, hurry, help, it’s not good.” Ms. LeJeune described Mrs. Granger as “turning in circles with the phone in her hand, shaking, [and] crying[.]” Ms. Le-Jeune went into the Grangers’ house and asked Nurse Gordon what was wrong. Nurse Gordon told Ms. LeJeune to give Mr. Granger “his last blessing.” Ms. Le-Jeune testified that, although she was uncertain as to what should have been done, Nurse Gordon was doing nothing to help her uncle, and that she thought Mr. Gran-ger was dead. At some point before the ambulance arrived, Ms. LeJeune went home to change her clothes to go to the hospital. In further describing Mrs. Gran-ger’s condition, Ms. LeJeune testified that she had seen her aunt upset many times over Mr. Granger’s continuing medical problems; but, on the day in question, Mrs. Granger was “lost” and did not have control of herself.
An AAS ambulance arrived at the Gran-gers’ residence at 2:52 p.m. At that time, 118Mr. Granger was not conscious, was breathing shallowly, had pinpoint pupils, and was cold, clammy, and sweaty. In assessing Mr. Granger’s condition, Paramedic Michael Averette noted that these symptoms were consistent with a morphine overdose. He also noted that Mrs. Granger was “conflicted” as to whether she wanted Mr. Granger to “be fixed” or brought to the hospital. He advised her that she could always terminate the efforts at a later time, and that Mrs. Granger then agreed to have Mr. Granger treated. At some point, Mr. Granger stopped breathing. Paramedic Averette “bagged” him with an oxygen device and intravenously gave him Narcon, a medication that counteracts morphine. Mr. Granger responded to these efforts and became completely awake and alert. Paramedic Aver-ette testified that, absent the resuscitation efforts, Mr. Granger “would have probably perished.” The AAS ambulance transported Mr. Granger to OLOLRMC, and Nurse Gordon drove Mrs. Granger to meet him there. Mr. Granger remained hospitalized for five days while he recovered from the effects of the morphine overdose.
Regarding Nurse Gordon’s failure to recognize the signs of morphine overdose, her delay in calling 911, and her statement *1085 to Mrs. Granger that Mr. Granger was “going down,” multiple witnesses testified as to whether these actions were a breach of the applicable standard of care.
Dr. Dunn, the NMC neurologist and pain specialist who cared for Mr. Granger after implantation of the pain pump, testified that Nurse Gordon should have recognized the possibility of a morphine overdose in her “differential diagnosis” of Mr. Granger’s condition. Dr. Dunn stated that, whether a nurse attributes her patient’s symptoms to a drug overdose or to a heart problem, “time of response” is an issue. He agreed that delaying response in either situation could result in a patient’s death. He also stated that Nurse Gordon did not recognize the overdose in a timely manner and did not follow the proper protocol in activating EMS, Dr. Dunn declined to state that a nurse’s declaration that a patient is “dying” was improper.[8]
Ms. Patti Granzin, an advanced practice nurse in pain management employed at |inNMC, was accepted as an expert in the field of nursing (Nurse Granzin). She testified that she knew how to fill pain pumps and had attended a Medtronic training course on the procedure. Based on her review of the depositions of Nurse Gordon and Mrs. Granger, she also testified that Nurse Gordon should have recognized Mr. Granger’s symptoms as signs of a morphine overdose. Nurse Granzin stated that, whether Nurse Gordon thought the symptoms were due to an overdose or to a heart problem, Nurse Gordon should have called 911 immediately, because, in either case, a quick response is “critical.” Nurse Granzin stated that Nurse Gordon’s failure to recognize the pocket fill, presuming Mr. Grangers’ symptoms were due to his heart condition, and her failure to call 911 immediately were violations of the applicable standard of care for nursing. She also stated that the standard of care for nurses does not include judgments as to whether a patient is dying, and that Nurse Gordon’s statement to Mrs. Granger that Mr. Granger was “going down” was improper.
Dr. Jason Hannegan, the internal medicine physician who treated Mr. Granger at OLOLRMC after the overdose and whose deposition was read into the record at trial, testified that the biggest symptom of morphine overdose is reduction in respiratory rate. Given Mr. Granger’s symptoms, Dr. Hannegan agreed that the most appropriate response by a registered nurse would have been to recognize the overdose, to call 911, and to then administer oxygen while waiting for EMS to arrive.
The defendants called Dr. Luba Ivanov, a college professor and former home health nursing instructor, who was qualified as an expert in nursing and public health nursing. Dr. Ivanov testified that the signs of a morphine overdose, including loss of consciousness, reduced heart rate, and reduced respiration, are similar to the signs of cardiac failure. Counsel for defendants showed Dr. Ivanov a chart that listed the classic symptoms of cardiogenic shock as: loss of consciousness, rapid breathing, rapid heart rate, decreased blood pressure, and skin which is cold, pale, and clammy. The same exhibit listed the classic symptoms of morphine toxicity as: loss of consciousness, shallow breathing, weak heart rate, decreased blood pressure, and skin which is cold and clammy. Dr. Ivanov noted that Mr. Granger’s symptoms on the day in question |2ocould have been attributable to either eardiogen *1086 ic shock or to morphine toxicity.[9] She testified that, when faced with Mr. Gran-ger’s condition, including her knowledge of his long-term and recent medical history, Nurse Gordon did not breach the applicable standard of care in her treatment of Mr. Granger. Dr. Ivanov acknowledged that some nurses would have included a morphine overdose in their differential diagnosis of Mr. Granger’s symptoms; but, she 'further stated that, after assessing the situation, Nurse Gordon diagnosed what she thought was going wrong with Mr. Granger and “took appropriate action,” including calling 911 “as soon as practical.” According to Dr. Ivanov, the applicable standard of care for nurses is to use their best judgment, skills, and efforts to ensure that they do their “best.” According to Dr. Ivanov, Nurse Gordon’s actions met this standard.
Nurse Gordon testified that, as a registered nurse, she had been trained to recognize the signs of a morphine overdose, but acknowledged that, on the day in question, it did not occur to her that such was the cause of Mr. Granger’s symptoms. She also acknowledged that whether Mr. Granger’s symptoms were caused by his heart condition or by a morphine overdose, getting prompt help to him was “critical.” She admitted that a reasonable person hearing that their husband was “going down” could think such meant he was dying. And, she explained that the reason she suggested that she and Mrs. Granger pray was to calm Mrs. Granger, who was frantic. When asked if she dialed 911 as fast as she could, Nurse Gordon responded that she called “as fast as Mrs. Granger allowed [her] to.” When later asked why she waited for Mrs. Granger to say when to call 911, Nurse Gordon explained:
Because in [h]ome [h]ealth, you don’t just assume that you can do certain things. You have a care-giver who is responsible for the [patient]. You have to make sure the care-giver ... wants you to do these things before you do them. Mr. Granger never made any decisions; Mrs. Granger made all decisions, and as her care-giver, my legal duty was to make sure it was okay with Mrs. Granger to call.... I have to listen to [the care-giver,] because I am in their home.
In ruling on the JNOV, the trial court made several pertinent findings. It determined Nurse Gordon understood how the pain pump worked, saw the swelling of |21Mr. Granger’s skin where the morphine was improperly injected, knew the medicine had improperly gone under his skin, and chose to do nothing about it. The trial court also determined Nurse Gordon should have called 911 immediately, even if she thought Mr. Granger’s symptoms were due to his heart, because “time [was] of the essence,” and she should have waited to pray with Mrs. Granger until after the 911 call had been made. With regard to Mr. Granger’s fault, the trial court observed, “[the jury] tagged the poor man for one percent I guess because it threw [Nurse Gordon] off her game plan when he said go get my mail.” The trial court also noted that “it was almost like [the jury was] hell bent on not assigning any fault to ... [Nurse] Gordon,” because they were “turned off’ by Mrs. Granger’s demeanor on the witness stand and became “enamored with their dislike for the [plaintiffs.” He stated that Mrs. Granger “was so bad emotionally that she just turned the [j]ury off.” With regard to Medtronic’s fault, the trial judge indicated that he was “shocked” when the jury came back with 97% fault to *1087 Medtronic, because “nobody could explain to me and this [j]ury, nobody, exactly what the recall was about.”
This court has carefully reviewed the record, including the trial transcript, the JNOV hearing transcript, and the voluminous evidence introduced at trial. After reviewing the totality of the evidence, we are forced to disagree with the trial court’s conclusion that no reasonable juror could conclude that Medtronic was 97% at fault for the Grangers’ damages; Nurse Gordon was 2% at fault; and Mr. Granger was 1% at fault. The question of whether a particular actor’s conduct falls below the applicable standard of care, and the appropriate allocation of fault when such substandard conduct is found, are distinctly factual inquiries. See Clement v. Frey, 95-1119, 1168 (La.1/16/96), 666 So.2d 607; Hypolite v. Columbia Dauterive Hosp., 07-357 (La.App. 3rd Cir.10/3/07), 968 So.2d 239, 243-44. As to the allocation of fault, the trier of fact is bound to consider the nature of each party’s wrongful conduct and the extent of the causal relationship between that conduct and the damages claimed. Townes v. Liberty Mutual Ins. Co., 09-2110 (La.App. 1st Cir.5/7/10), 41 So.3d 520, 529. It is evident that the jury’s findings in this case regarding the applicable standard of care and the Improper allocation of fault were based in large measure on credibility determinations. In such cases, the Louisiana Supreme Court has emphasized the importance of deferring to the trier of fact’s findings because of the trier of fact’s better capacity to evaluate live witnesses. See Purvis v. Grant Parish School Board, 13-1424 (La.2/14/14), 144 So.3d 922, 927, 2014 WL 683721. However, in determining whether a JNOV is warranted, the trial court should not evaluate the credibility of witnesses and must resolve all reasonable inferences of factual questions in favor of the non-moving party. See Joseph, 772 So.2d at 99.
First, with regard to Medtronic’s fault, the jury in this case heard conflicting testimony from the witnesses and apparently determined that Medtronic’s training of Nurse Gordon was significantly deficient and was the main cause of the Grangers’ injuries. Mr. McDaniel testified that the Medtronic training included a discussion about pocket fills, as well as an explanation regarding how to properly read the interrogator. On the other hand, Nurse Gordon testified that her Medtronic training did not include any discussion regarding pocket fills. Her position on this issue is corroborated by the Medtronic recall, and despite the trial court’s statement that the recall was not “explained,” the evidence introduced at trial plainly demonstrated that the recall was issued specifically to address the inadequacy of the Medtronic warnings regarding pocket fills. And, contrary to the trial court’s finding that Nurse Gordon saw the swelling of Mr. Granger’s skin where the morphine was improperly injected, Nurse Gordon specifically testified that she completed Mr. Granger’s pain pump refill without problem and did not see any “bump” or swelling. Further, the jury heard Nurse Gordon state her belief that she had indeed injected the entire dosage of prescribed morphine (“twenty c.e.’s”) into Mr. Granger’s pain pump, because after completing the injection, the interrogator reading indicated that the entire dosage had gone into the pump. The jury had this factual basis upon which to decide that Medtronic inadequately explained the interrogator’s function to Nurse Gordon, which, again, is contrary to the trial court’s finding that Nurse Gordon “understood how the pain pump worked.”
The above evidence is of sufficient quality and weight that the jury reasonably 12gCould have concluded Medtronic failed to *1088 adequately train Nurse Gordon on the pain pump refill procedure, and that due to the inadequate training: (1) she did not know of the risk of pocket fills; (2) she had no basis to believe that the morphine had gone anywhere but into Mr. Granger’s pain pump; (3) she reasonably interpreted the interrogator reading as indicating the morphine had indeed gone into the pain pump; and (4) she reasonably did not consider a morphine overdose as a possible cause of Mr. Granger’s symptoms. Based on these facts adduced at trial, and resolving all reasonable inferences and factual questions in favor of the non-moving parties, Unique and Nurse Gordon, the jury had a reasonable basis to conclude that Medtronic’s inadequate training was the main cause of Nurse Gordon’s failure to recognize the signs of morphine overdose and of the Grangers’ injuries.
Next, a further basis for the jury’s minimal apportionment of 2% of fault to Nurse Gordon was its conclusion that she did not breach the applicable standard of care in failing to call 911 immediately when Mr. Granger’s symptoms appeared. Dr. Dunn, Nurse Granzin, and Dr. Hannegan were in agreement that Nurse Gordon should have called 911 immediately, whether she thought Mr. Granger’s symptoms were due to his heart condition or a morphine overdose. However, Dr. Ivanov disagreed, stating that Nurse Gordon “took appropriate action” after assessing Mr. Granger’s condition and called 911 as soon as practical. Further, none of the Gran-gers’ experts specifically testified that the standard of care for home health nurses required Nurse Gordon to “override” Mrs. Granger, as Mr. Granger’s caretaker, in her indecisiveness regarding if and when the 911 call was to be made. There is more than ample evidence in the record from which the jury could have rationally found that Nurse Gordon repeatedly advised Mrs. Granger to call 911, that she properly deferred to Mrs. Granger’s wishes regarding that decision, but that Mrs. Granger steadfastly refused to make this decision until after she sought counsel from the Ochsner transplant team. In assessing only 2% of fault to Nurse Gordon, the jury must have chosen to give more weight to her testimony and the testimony of Dr. Ivanov to reach the determination that Nurse Gordon used the proper degree of nursing skill, care, and diligence, as well as her best | ¾,judgment, in caring for Mr. Granger.
With regard to Mr. Granger’s fault, the trial court surmised that the jury’s allocation of 1% of fault to him was because his request that Nurse Gordon get his mail threw her off of her “game plan.” Despite Mr. and Mrs. Grangers’ denial at trial that the mail incident ever occurred, we agree with the trial court’s supposition that the jury apparently chose to believe Nurse Gordon’s testimony on the issue. We disagree, however, with the trial court’s decision to remove the jury’s assessment of 1% fault to Mr. Granger because of this conduct. The trial court improperly substituted its judgment for that of the jury in deciding otherwise.
Under the “rigorous standard” applicable to a JNOV, which equally applies to our analysis on appeal, our review of the record indicates the trial court erred: in granting the JNOV; by making its own credibility determinations, including its observation that the jury “got enamored with their dislike for the [pjlaintiffs”; and in concluding that the facts and inferences pointed overwhelmingly in favor of the Grangers, such that the jury unreasonably arrived at an improper allocation of fault. The trial court obviously viewed the facts, assessed witness credibility, and apportioned fault differently than the jury did in this case; we note, however, that “when *1089 there is a jury, the jury is the trier of fact,” not the trial court. See Joseph, 772 So.2d at 99, citing Scott v. Hospital Serv. Dist. No. 1, 496 So.2d 270, 273 (La.1986). Accordingly, we reverse the trial court’s grant of the JNOV on the allocation of fault and reinstate the jury’s verdict on this issue.
General Damages
We next examine the trial court’s granting of the JNOV on the issue of damages. The trial court increased the jury’s general damage award to Mr. Granger from $20,000 to $50,000 and to Mrs. Granger from $1,000 to $20,000. The defendants contend the trial court erred in increasing these awards because the jury’s awards were supported by the record.
General damages involve mental or physical pain or suffering, inconvenience, loss of gratification or intellectual or physical enjoyment, or other losses of lifestyle that cannot be measured definitively in terms of money. Boudreaux v. Farmer, 604 So.2d |pj¡641, 654 (La.App. 1st Cir.), units denied, 605 So.2d 1373 and 1374 (La.1992). The factors to be considered in assessing quantum of damages for pain and suffering are severity and duration. Jenkins v. State ex rel. Dep’t of Transp. and Dev., 06-1804 (La.App. 1st Cir.8/19/08), 993 So.2d 749, 767, writ denied, 08-2471 (La.12/19/08), 996 So.2d 1133. Much discretion is left to the trier of fact in the assessment of general damages. See LSA-C.C. art. 2324.1.
On review of a JNOV award of higher quantum, the appellate court again employs the same criteria as the trial court. If reasonable persons, in the exercise of impartial judgment, could reach differing opinions on the assessment of damages, and the award was not abusively low, then the trial court errs in granting a JNOV and the jury’s damage award should be reinstated. See Junot v. Morgan, 01-0237 (La.App. 1st Cir.2/20/02), 818 So.2d 152, 160; see also Scott, 496 So.2d at 274-75; Trunk v. Medical Center of La., 04-0181 (La.10/19/04), 885 So.2d 534, 539; Mason v. Hilton, 13-2073 (La.App. 1st Cir.11/7/13), 2013 WL 5969104, at *2 (unpublished). On the other hand, if reasonable persons could not disagree, then the trial court properly grants the JNOV, and this court reviews the damage award based on the trial court’s independent assessment of damages under the abuse of discretion standard. See Junot, 818 So.2d at 161. This determination is made with consideration to the individual circumstances of the injured plaintiff.
Mr. Granger’s Damages
On the day of the June 17, 2010 incident, after the emergency medical technicians stabilized Mr. Granger, the AAS ambulance transported him to OL-OLRMC, where he presented with complaints of numbness and tingling in his hands and feet. He was placed on a Nar-can drip and admitted to the intensive care unit for monitoring. Dr. Dunn was summoned to evaluate Mr. Granger’s pain pump. Upon his arrival, Dr. Dunn noted that Mr. Granger was “sleepy but arousa-ble” and had pinpoint pupils. When assessing Mr. Granger’s pain pump, Dr. Dunn noted a “spongy” area of fluctuance outside of the pump’s reservoir port. He interrogated the pump, which gave a reading of twenty milliliters; but, when he aspirated the fluid from inside the pain |2(¡pump, he only withdrew 0.5 milliliters of fluid. He then aspirated approximately two milliliters of serosanguinious fluid from the spongy area of tissue near Mr. Granger’s pain pump and sent it to a labo *1090 ratory for testing.[10] He reprogrammed Mr. Granger’s pain pump for a minimum rate and maintained him on the Narcan drip.
The following morning, June 18, 2010, Mr. Granger was alert, still somewhat confused, and was able to sporadically remember the prior day’s events. The Narcan drip was gradually discontinued, and his pain pump was refilled. On June 20, 2010, Dr. Hannegan examined Mr. Granger and found him to be “awake, alert, pleasant, and cooperative.” At that time, Mr. Gran-ger did not appear to be experiencing any ill effects from the morphine overdose. In his deposition testimony admitted into evidence at trial, Dr. Hannegan stated that any long term effects of a morphine overdose depend on the “severity” of the overdose. And, the parties stipulated prior to trial that, if called to testify live, Dr. Han-negan would testify that, in his expert medical opinion, it was more likely than not that Mr. Granger “was asymptomatic of any alleged morphine overdose on the date of discharge from Our Lady of the Lake Hospital, June 22, 2010.”
In a follow-up appointment with Dr. Dunn on June 24, 2010, seven days after the incident, Mr. Granger presented with complaints of increased stinging in his hands and his feet, a headache for the last two days, and blurry vision. Dr. Dunn ordered an MRI to assess Mr. Granger’s headache; advised him to follow up with his transplant team for cyanosis and ongoing hypoxia; noted he most likely would require oxygen in the interim; and asked Mr. Granger to return in one week. On July 7, 2010, twenty days after the incident, Dr. Dunn saw Mr. Granger and noted “[h]e virtually has no pain.” He also noted that Mr. Granger’s pain pump was in good working condition, and that Mr. Granger was “back to baseline” with regard to the pump.
Mrs. Granger’s Damages
It is undisputed that Mrs. Gran-ger suffered mental anguish as a result of the events surrounding Mr. Granger’s morphine overdose on June 17, 2010. By way of background, Mrs. Granger cared for Mr. Granger continuously during the many years of |s>7his multiple health problems. Following his heart transplant in 1994, Mr. Granger developed multiple chronic conditions, which required that Mrs. Granger manage continuous doctor appointments, surgical procedures, daily administration of his numerous medications, and repeated hospital visits. This demanding schedule still existed at the time of trial in 2012, when approximately one week before trial, Mr. Granger had been hospitalized for the insertion of additional stents in his transplanted heart.
In addition to Mr. Granger’s medical issues, Mrs. Granger had medical issues of her own. Beginning in 1998 and continuing through the date of the trial, Mrs. Granger was treated with various medications for anxiety and depression. And, in 2008, she was diagnosed with and treated for breast cancer, after which she regularly began seeing Nurse Practitioner Sydney Prescott at Ochsner Clinic of Baton Rouge. At trial, Ms. Prescott testified that, at that time, Mrs. Granger was “very anxious” about her cancer diagnosis, as well as Mr. Granger’s health. She acknowledged, at trial, that Mrs. Granger had been “very fragile for a very long time” and that it was fair to state that her fragility “was focused on her concern for her husband and her husband’s welfare.” She indicated that, at one of her appointments after the June 17, 2010 incident, *1091 Mrs. Granger was “very frustrated and anxious” about what happened. She also stated that Mrs. Granger’s medications were changed to address these symptoms; however, the record is unclear as to the timing of the medication change, because Ms. Prescott’s records indicated that the first time Mrs. Granger saw her after the June 17, 2010 incident was in October 2011, approximately nineteen months later.
At trial, Mrs. Granger’s fragile personality was confirmed by Dr. Gary Rostow, a psychologist who assessed her condition and gave her a standard battery of psychological tests in 2011. Dr. Rostow described Mrs. Granger as “an eggshell client,” with a long standing major depressive illness, who was often confused, inconsistent, | ^incoherent, and who fell apart under stress.[11] He opined that Mrs. Gran-ger was not mentally in a state to rationally make a “life or death” decision for Mr. Granger on June 17, 2010. He further opined that Mrs. Granger suffered from a form of post traumatic stress disorder, at least in part due to the June 17, 2010 incident; but, he admitted on cross examination that he could not completely rule out the possibility that Mrs. Granger’s post traumatic stress disorder pre-dated the incident. After his testing of Mrs. Granger, Dr. Rostow recommended that she seek psychiatric care for medication management as well as mental health counseling.
In its reasons for increasing the general damages awarded to Mr. and Mrs. Gran-ger, the trial court emphasized that both increases were warranted, in part, because of the fact that Mr. Granger “died” on June 10, 2010, apparently referring to the fact that Mr. Granger stopped breathing at some point while being attended by the AAS medical personnel. The jury heard this evidence, as well as much other evidence regarding the severity and duration of the pain and suffering endured by both Mr. and Mrs. Granger as a result of the June 17, 2010 incident. With regard to Mr. Granger, the evidence showed he was in poor health before the overdose, suffered physically and mentally because of the overdose, was hospitalized for five days while recovering from the overdose, and possibly had lingering physical effects for up to two weeks after the incident. With regard to Mrs. Granger, the evidence showed that she was mentally fragile before Mr. Granger’s overdose, suffered considerable anguish thinking her husband was dying on the day of the incident, and possibly experienced a form of post traumatic stress disorder for a significant time after the incident.
A thorough review of the evidence indicates that reasonable persons, in the exercise of impartial judgment, could have reached differing opinions on the amount of general damages to which the Grangers were entitled. After evaluating the evidence, including the credibility of the fact and expert witnesses who testified, and resolving the conflicting evidence regarding the pain and suffering experienced by Mr. and Mrs. |¾)Granger, the jury had the prerogative to accept or reject, in whole or in part, any of the evidence it heard, and to assess general damages accordingly. See LSA-C.C. art. 2324.1. The jury obviously believed Mr. Granger sustained significant physical and mental pain and suffering as the patient who received the morphine overdose, by awarding him $20,000 in general damages. On the other hand, the jury apparently must have be *1092 lieved that Mrs. Granger’s fragüe mental state existed for many years before the June 17, 2010 incident, did not change significantly because of the June 17, 2010 incident, and continued to exist well after the incident. Further, the Grangers’ credibility was at issue throughout the trial.
In light of the conflicting nature of the evidence presented at trial, and resolving all reasonable inferences and factual questions in favor of Unique and Nurse Gordon, we cannot say that the jury’s award of $20,000 in general damages to Mr. Gran-ger and $1,000 in general damages to Mrs. Granger was abusively low. Stated differently, based on the evidence, reasonable persons, in the exercise of impartial judgment, could reach differing opinions on the assessment of damages in this case. See Trunk, 885 So.2d at 540. Thus, the trial court erred in granting the JNOV on this issue. Accordingly, we reverse the trial court’s grant of the JNOV on the amount of general damages and reinstate the jury’s verdict on this issue.[12]
DECREE
For the above reasons, we find the jury’s verdict was reasonably supported by the evidence presented in this case. Consequently, the trial court erred in granting Abel and Cora Granger’s motion for judgment notwithstanding the verdict on the issue of fault and damages. The trial court’s December 6, 2012 judgment notwithstanding the verdict is reversed. The jury’s verdict, together with the trial court’s June 18, 2012 judgment rendered in accordance with the jury’s verdict, is reinstated. That judgment |Mwas rendered against Unique Home Health Care, Inc. and Lynette Gordon, in solido; in favor of Abel Granger for $568.47 in past medical expenses and $400 in general damages; and in favor of Cora Granger for $20 in general damages. This matter is remanded for a determination of the proper assessment of trial court costs.[13] Costs of the appeal are assessed to Abel and Cora Granger;
JUDGMENT NOTWITHSTANDING THE VERDICT REVERSED; JURY VERDICT REINSTATED; ORIGINAL JUDGMENT DATED JUNE 18, 2012, REINSTATED; CASE REMANDED.
GUIDRY, J., concurs in the result.
DRAKE, J., dissents without reasons.

. Dr. Hector Ventura, the Ochsner cardiologist who had treated Mr. Granger since his heart transplant in 1994, acknowledged in his deposition that the statistical "average life span” of a transplanted heart is 9.1 years.

. See LSA-C.C. art. 2323, which addresses comparative fault of parties and non-parties.

. The judgment also assessed the defendants with 2% of the Grangers’ legally recoverable court costs to later be determined by a rule to show cause. On December 3, 2012, the trial court signed a “Ruling of the Court” stating that the "language” regarding costs in the June 18, 2012 judgment was "null.” In a judgment signed December 6, 2012, the trial court granted a judgment notwithstanding the verdict in favor of the plaintiffs, reallocated fault, increased the general damage award, and cast the defendants for all costs of the proceedings.

. When asked to describe the mail incident, Nurse Gordon testified:
I had the sterile gloves on, and I had Mr. Granger prepped to start the procedure. His mail lady blew outside. He said, "I”— he needed to go and get the mail, and I said, “We’re doing the procedure; it can wait.” Mr. Granger said, “No; either I go get the mail, or you go get the mail[.”] So he kind'da did this to get up, and I said, “Well, I'll go.” So I took my sterile gloves off; went outside and got his mail; came back in the house; put his mail on the table; washed my hands; put on another pair of sterile gloves; then I proceeded to do the rest of the procedure.

. Ms. Patti Granzin, an advanced practice nurse whose testimony will be addressed later, gave her opinion on the mail incident. She stated that, had she been in Nurse Gordon’s position, faced with Mr. Granger's insistence that the mail be retrieved, she either would have "called it off for the night” and not filled Mr. Granger’s pain pump, or she would have called Dr. Dunn.

. Regarding the pain pump refill process, Dr. Dunn explained: "You put the template over the pump. It’s hard plastic, you take a needle and you put it right in the middle where the hole is. If it’s not in the right spot, then you’ll know it.” He agreed that, once the needle is in, it is not supposed to be removed until the refill procedure is complete. He also agreed that, if this protocol was followed, he would not expect a pocket fill to occur.

. During his testimony, Dr. Dunn apparently referenced two reports in which he gave his medical opinion regarding Nurse Gordon’s conduct. The location of these reports in the appellate record is unknown.

. Dr. Hannegan also acknowledged that Mr. Granger’s symptoms could have been caused by a condition other than a morphine overdose.

. Although Dr. Dunn testified that the fluid "came back positive for morphine," no specific document in the medical records has been identified as verifying this fact.

. Mrs. Granger’s demeanor at trial confirmed these traits. During her testimony: she cried; claimed to have problems with her memory; refused to read an exhibit shown to her because she was "too nervous” to read; testified inconsistently regarding Nurse Gordon’s call to 911; and, accused defense counsel of "badgering” her.

. In addition to challenging the trial court's JNOV on appeal, the defendants challenged the trial court's denial of their motion for directed verdict as to what they characterized as Mrs. Granger’s "bystander recovery claim.” In ruling on a directed verdict, the standard that applies is the same as that used for ruling on a JNOV. Belanger v. Stephen, 12-0278 (La.App. 1st Cir.l 1/14/12), 2012 WL 5506648, at *8 (unpublished), writ denied, 12-2679 (La.4/1/13), 110 So.3d 581. We find no merit to the defendants' argument regarding the denial of their motion for directed verdict for the same reasons we reverse the trial court's grant of JNOV and reinstate the jury verdict.

. The original judgment assessed the defendants with 2% of the Grangers' legally recoverable court costs, which were to be determined later by a rule to show cause. On December 3, 2012, the trial court signed a "Ruling of the Court” stating that the "language” regarding costs in the original judgment was "null.” In a judgment signed December 6, 2012, the trial court granted the JNOV in favor of the plaintiffs, reallocated fault, increased the general damage awards, and cast the defendants for all costs of the proceedings. Because we reinstate the original judgment, the determination of trial court costs remains to be addressed on remand.