CRAIN, J.
|2In this personal injury case, the plaintiff, a shop employee of an oilfield services company, filed suit against the defendants, an equipment fabricator and its forklift operator, for injuries the plaintiff sustained when a generator cover being delivered by the forklift operator tipped over and fell on plaintiffs foot. After a trial, the jury returned a verdict assessing 90% fault to the plaintiff and his employer and 10% fault to the defendants, and awarded special and general damages. On plaintiffs motion, the trial court granted, in part, a judgment notwithstanding the verdict (JNOV), and reapportioned fault, finding that the plaintiff and his employer were 50% at fault, and the defendants were 50% at fault, in causing the plaintiffs injuries.
The defendants appeal the trial court’s entry of the JNOV. The plaintiff answered the appeal seeking an increase in general damages and an allocation of 100% fault to the defendants. The intervenor, the workers’ compensation insurer for the oilfield services company, also answered the appeal, asserting the same challenges made by the plaintiff. We reverse the partial grant of JNOV, reinstate the jury verdict, and affirm in all other respects.
FACTUAL AND PROCEDURAL BACKGROUND
Shamrock Management, L.L.C. is an oilfield services company located in Houma, Louisiana. In 2009, Shamrock’s business included the manufacture of generator systems for use in the oilfield industry. Cajun Cutters, Inc., a machinery and fabrication business, was located across the street from Shamrock. The two businesses had a longstanding business relationship of approximately fifteen years, and Cajun Cutters often fabricated pieces of equipment for Shamrock.
In early 2009, Shamrock was assembling a large generator package, which consisted of a steel skid base supporting an engine, generator, and a custom built aluminum cover that fit over the top. The rectangular generator cover was ^approximately 7 feet wide by 9 feet tall by 16 feet long, and weighed 2,800 pounds. Although Cajun had not fabricated this particular generator cover, Shamrock had issued a purchase order for Cajun to paint the generator cover.
Cajun’s usual practice was to deliver items ordered by Shamrock to Shamrock’s shop. On this occasion Cajun contends that it agreed to deliver the generator cover to Shamrock on February 12, 2009, but that on February 11, 2009, Rene “Bub-ba” Himel, Jr., a Shamrock manager, went to the Cajun shop and “told” Russel Felio, a Cajun painter, to deliver the generator cover when the paint dried. At trial, Hi-mel did not remember who he told to make the delivery on February 11 and denied that the delivery was planned for the next day.
On February 11, Felio, a certified forklift operator, used a small forklift to deliver two pallets holding the doors and windows for the generator cover to the Shamrock shop. Later that day and without any authorization from a Cajun supervisor, Felio attempted to deliver the generator cover to Shamrock’s shop using a larger Hyster forklift that he was not authorized to use. The plaintiff, Westley *60 Bourg, a recently-hired Shamrock employee, laid down multiple 4 foot by 4 foot timbers near the shop entrance to create a base for the placement of the generator cover. As the forklift driven by Felio approached the Shamrock shop entrance, Himel and John Paul Chaisson, another Shamrock manager, guided him up a ramp leading into the Shamrock shop, while Bourg acted as a spotter. After the generator cover was set on the timbers, Felio began to back the forklift from under the generator cover and down the ramp. As he did so, the forks on the forklift began to drag, then caught the edge of the generator cover and flipped it onto its side, crushing Bourg’s left foot. Bourg ultimately underwent two surgeries to repair the injuries to his foot.
Bourg filed this suit against Felio and Cajun, alleging negligence by both and the vicarious liability of Felio’s employer, Cajun. The defendants answered |4the suit contending Bourg was solely or comparatively at fault in causing his injury, and further contending that Bourg and Felio were statutory co-employees, limiting Bourg’s recovery to workers compensation benefits. The workers’ compensation insurer for Shamrock, Louisiana Oilfield Contractors Association (LOCA), filed a petition of intervention seeking subrogation to Bourg’s rights for past and future workers’ compensation payments for Bourg.
Bourg’s suit proceeded to a jury trial in August 2012. The jury determined that the negligence of Bourg, Shamrock, Felio, and Cajun caused the accident. The jury apportioned 90% fault to “Shamrock Management, LLC (including Westley Bourg)” and 10% fault to Cajun and Felio. The jury also awarded Bourg special and general damages totaling $1,937,242.2o.[1] On September 20, 2012, the trial court signed a judgment in accordance with the jury’s verdict in favor of Bourg and LOCA and against the defendants, in solido, in the amount of $193,724.22. The judgment deferred the determination and assessment of court costs, as well as other amounts owed to LOCA, to a hearing on a later date.
Bourg filed a motion for judgment notwithstanding the verdict and for new trial, arguing that Cajun was 100% at fault and that he was entitled to $2 million in general damages. Bourg also filed a motion to assess costs and stated that his litigation costs totaled $59,792.88. The defendants opposed Bourg’s motion for JNOV and new trial and filed their own motion to determine costs. LOCA filed a motion for JNOV and new trial for the same reasons asserted by Bourg.
After a hearing, the trial court signed a judgment on January 7, 2013: (1) denying Bourg’s and LOCA’s motions for new trial; (2) granting in part, and denying in part, Bourg’s motion for JNOV; (3) reallocating the jury’s ^apportionment of fault to 50% fault to Bourg and Shamrock and 50% fault to Felio and Cajun; (4) denying an increase in general damages; (5) rendering judgment in favor of Bourg and LOCA, and against the defendants, in solido, for $1,937,242.20, plus legal interest from'the date of judicial demand, until paid, and noting that the apportionment of the award would be by separate judgment;[2] *61 (6) granting Bourg’s motion to assess costs in the amount of $59,792.88, plus any additional costs incurred by Boürg after September 15,-2012; (7) assessing 70% of costs to the defendants, 10% to LOCA to be paid to Bourg, and 20% to Bourg.[3]
The defendants suspensively appealed seeking reinstatement of the jury’s verdict and challenging the trial court’s assessment of costs.[4] Bourg answered the appeal challenging the assessments of fault by both the trial court and the jury, challenging the jury’s general damage award, and challenging the trial court’s assessment of costs. LOCA answered the appeal asserting the same challenges made by Bourg.
JUDGMENT NOTWITHSTANDING THE VERDICT
A JNOV is a procedural device authorized by Louisiana Code of Civil Procedure article 1811, by which the trial court may correct an erroneous jury verdict by modifying the jury’s finding of fault or damages, or both. Marroy v. Hertzak, 11-0403 (La.App. 1 Cir. 9/14/11), 77 So.3d 307, 316. Article 1811 does not set-out the criteria to be used when deciding a motion for JNOV. Wood v. Humphries, 11-2161 (La.App. 1 Cir. 10/9/12); 103 So.3d 1105, 1110, writ denied, 12—2712 (La.2/22/13), 108 So.3d 769. However, the Louisiana Supreme Court has established the following standard:
[A] JNOV is warranted when the facts and inferences point so strongly and overwhelmingly in favor of one party that the trial court-believes that reasonable persons could not arrive at a contrary verdict. The motion should be granted only when the evidence points so strongly in favor of the moving party that reasonable persons could not reach different conclusions,, hot merely when there is a preponderance of evidence for the mover. The motion should be denied if there is evidence opposed to the motion which is of such quality and weight that reasonable and fair-minded persons in the exercise of impartial ■judgment might reach different conclusions. In making this determination, the trial court should not evaluate the credibility of the witnesses, and all reasonable inferences or factual questions should be resolved in favor of the non-moving party. ' This rigorous standard , is based upon the principle that “[w]hen there is a jury, the jury is the trier of fact.”
Joseph v. Broussard Rice Mill, Inc., 00-0628 (La.10/30/00), 772 So.2d 94, 99 (citations omitted).
An appellate court reviewing a trial court’s grant of a JNOV employs the same criteria used by the trial court in deciding whether to grant the motion. See Smith v. State, Department of Transportation and Development, 04-1317 (La.3/11/05), 899 So.2d 516, 525. In other words, the appellate court must determine whether the facts and inferences adduced at trial point so overwhelmingly in favor of the moving party that reasonable persons could not arrive at a contrary finding of *62 fact. Id. If the answer is in the affirmative, then the appellate court must affirm the grant of the JNOV. Id. However, if the appellate court determines that reasonable minds could differ on that finding, then the trial court erred in granting the JNOV, and the jury verdict should be reinstated. Id.
Therefore, our initial inquiry in this case is: did the evidence overwhelmingly support a finding that reasonable jurors could not have apportioned 90% of fault to Bourg and Shamrock and 10% of fault to Felio and Cajun? If so, then the trial court was correct in granting the JNOV, and we must then conduct a manifest error review of the trial court’s independent apportionment |7of fault. See Granger v. United Home Health Care, 13-0910 (La.App. 1 Cir. 6/19/14), 145 So.3d 1071, 1077-78: Gutierrez v. Louisiana Department of Transportation and Development, 11-1774 (La.App. 1 Cir. 3/23/12), 92 So.3d 380, 386, writ denied, 12-1237 (La.9/21/12), 98 So.3d 343. If, however, reasonable jurors in the exercise of impartial judgment could reach the conclusion that Bourg and Shamrock and Felio and Cajun were at fault as apportioned by the jury, then the trial court erred in granting the JNOV and the jury’s verdict should be reinstated. See Granger, 145 So.3d at 1078; Gutierrez, 92 So.3d at 386. We perform our appellate review under the same rigorous standards that governed the trial court’s determination of whether a JNOV was warranted, without evaluating the credibility of witnesses, and resolving all reasonable inferences or factual questions in favor of the non-moving parties, Felio and Cajun. See Granger, 145 So.3d at 1078; Gutierrez, 92 So.3d at 385-86.
In negligence cases, Louisiana courts have adopted a duty-risk analysis to determine whether liability exists under the facts of a particular case. Under this analysis, a plaintiff must prove five separate elements: (1) the defendant had a duty to conform his or her conduct to a specific standard of care; (2) the defendant failed to conform his or her conduct to the appropriate standard of care; (3) the defendant’s substandard conduct was a cause-in-fact of the plaintiffs injuries; (4) the defendant’s substandard conduct was a legal cause of the plaintiffs injuries; and (5) actual damages. Brewer v. J.B. Hunt Transport, Inc., 09-1408 (La.3/16/10), 35 So.3d 230, 240. However, when a defendant claims that a plaintiff is comparatively at fault in causing his damages, the defendant bears the burden of showing not only the plaintiffs fault, but the percentage thereof. See Granger, 145 So.3d at 1078. Thus, in this case, Bourg had the burden of proving the fault of Felio and Cajun, and Felio and Cajun had the burden of proving the comparative fault of Bourg and Shamrock.
IsConduct of Felio and Cajun
The record shows that Cajun employed Felio as a painter, not as a forklift operator. Felio explained that on the day of the accident, February 11, he painted the generator cover and it was drying. According to Felio, at some point Himel, Shamrock’s instrumentation and electrical department manager, came to Cajun’s shop “ranting and raving” that the generator cover needed to be delivered. Using the small forklift, Felio delivered two pallets holding the doors and windows for the generator cover to Shamrock’s shop without incident. According to Felio, later in the afternoon on February 11, and without direction from his immediate supervisors, who were not present, he “[pjretty much took it upon myself’ to deliver the generator cover to Shamrock. He knew Himel was upset and decided to make the delivery because Shamrock wanted the generator cover. *63 Felio knew he did not have to take orders from any Shamrock manager. On cross-examination he stated that, despite what he might have indicated in an earlier deposition, Himel had not given him an “actual straight direction” to deliver the generator cover, and that he did not know the delivery was scheduled for the next day.
Felio used the larger Hyster forklift to deliver the generator cover because it was used for large, awkward, or hard to move objects, and, in this case particularly, because its forks were long enough to reach across to the far wall of the bottomless generator cover. He crossed the street from Cajun’s shop to Shamrock’s shop and because his visibility was limited by the size of the generator cover, Himel and Chaisson guided him up the ramp to Shamrock’s shop. Bourg stood inside the shop as a spotter. Felio lowered the generator cover onto the timbers that Bourg had positioned immediately inside the doors of the shop. He then started backing the forklift out of the shop and down the ramp when the forklift fork elbows began to drag on the ground. Himel, who was now standing inside the generator cover, told Felio to tilt the forks down. Felio did so, but continued to back up and the 1 ¡forks caught the edge of the generator cover and flipped it onto its side. Bourg’s left foot was crushed under the generator cover.
Felio admitted that the February 11 delivery was the first time he had ever driven the Hyster forklift up the Shamrock shop ramp and the first time he had delivered a generator cover to Shamrock. He did not feel he needed prior Cajun authority to make the delivery, because “over the years we did what it took to get the job done” and he had been “across that street many times.” He stated that before making the delivery he should have, but did not, perform a “job safety analysis” to assess and address any potential hazards.[5] He testified that flipping the generator cover was “[t]o a great extent” his fault.
Felio also felt the condition of the Hy-ster forklift contributed to the accident because it had “no brakes.” He explained that he tried to brake when he saw the forks tilting the generator cover, but he was rolling backwards down the ramp and it was too late by the time the forklift’s “transmission finally caught and slowed [him] down.” When asked if he could have backed down the ramp with the generator cover to place it somewhere else, Felio responded negatively, again stating that the Hyster forklift had “no brakes.” He stated that he had reported the Hyster forklift’s lack of brakes to Cajun management and had submitted “stop cards” documenting his concern, but that the brakes had not been fixed.[6] He also admitted that, with regard to the Bourg accident, he did not mention any brake malfunction until the week before the start of the trial of Bourg’s lawsuit.
Danny Besson, a Cajun supervisor at the time of the accident, was responsible for arranging deliveries to Shamrock. He testified that Cajun’s job of | inpainting the generator cover included delivering it to Shamrock’s shop and that deliveries such as this were usually arranged through Cajun and Shamrock supervisors. According to Besson, he talked to Himel and Chais-son “ten, fifteen times a day, everyday” *64 and they would “plan [their] business.” He stated that the delivery of the generator cover was scheduled for February 12. According to Besson, he knew the doors and windows for the generator had been delivered to Shamrock earlier on February 11, and although Himel wanted the cover itself delivered on that day, there was not enough room in the Shamrock shop to put everything. Besson told Himel that Cajun would deliver the generator cover the next morning after Shamrock had made sufficient room, and Himel did not seem to be upset about this arrangement. Besson directed Greg Lovell, the Cajun paint supervisor, to have the generator cover placed in the Cajun parking lot, where Besson planned for either he or “Chad,” one of Cajun’s forklift operators, to pick up the generator cover the next morning and deliver it. Besson then left work for the day and went to a nearby store. While there, he saw an ambulance pass; he returned to Cajun, where Felio told Besson that he had delivered the generator cover to .Shamrock and that the accident had happened. Besson went over to the Shamrock shop and saw that the timbers had been placed “right at the edge of the door.”
Besson testified that both Shamrock and Cajun employees knew which Cajun employees were authorized to use the Hyster forklift to make deliveries such as the generator cover, and that Felio was not one of them. He stated that he was authorized, and that he could have safely delivered the generator- cover up the Shamrock ramp and onto the timbers. ’ According to Bes-son, only Cajun personnel would have been involved had the delivery been made as planned, and Shamrock employees would not have participated. He further testified that a meeting of Shamrock and Cajun personnel was held at Shamrock’s site the morning after the Inaccident. ’ At that meeting, Himel, who was very upset, admitted that he had directed Felio to deliver the generator cover the previous day. Besson noted that no mention of a brake malfunction was made at the meeting nor had he before received any complaints from Felio or anyone else about the Hy-ster forklift’s brakes. He explained that the Hyster forklift was designed to hesitate for a few seconds before the brakes engaged.
Tommy Aston, Cajun’s president and owner, testified at trial. He confirmed it was standard protocol for Shamrock and Cajun managers to 'schedule deliveries such as the one at issue. He said Cajun and Shamrock had a good working relationship and Shamrock project' managers were in the Cajun shop “all the time.” However, he explained that Shamrock was Cajun’s customer, Shamrock personnel did not have authority to give orders to Cajun employees, and this was known by Shamrock management and Cajun employees. At the post-accident meeting, Aston heard Himel say he had told Felio to deliver the generator cover the previous afternoon; Aston then informed Himel that he did not have authority to tell a Cajun employee what to do, and he had to “go through management” to get things done. According to Aston, Shamrock employees would not have participated in the delivery if Shamrock would have involved Cajun management. He confirmed that Felio was not authorized to make the delivery, but he had “no doubt” that Besson could have safely delivered the generator, cover to Shamrock the next day, as was Cajun’s plan. He said a brake failure was not mentioned at the post-accident meeting and Felio had not either verbally or by a stop card previously reported a problem with the Hyster forklift’s brakes to Cajun. He explained that the Hyster forklift was designed with a clutch brake that had a built-in delay.
*65 Mitch Thibodaux, Cajun’s safety manager at the time of the accident, also testified at trial. He confirmed that Besson was in charge of arranging deliveries to Shamrock, that deliveries such as this were usually scheduled, and the generator |12cover delivery was scheduled for February 12. He said only three Cajun employees had the experience to drive the Hyster forklift up the Shamrock ramp, and Felio was not one of them. He also attended the post-accident meeting on February 12 where he heard Himel say he told Felio the day before to deliver the generator cover. Thibodaux also testified that. Cajun reviewed the stop cards submitted by its employees during 2008 and 2009 and none involved a malfunction of the brakes on the Hyster forklift; nor did he recall any mention of bad brakes at the post-accident meeting.
Conduct of Bourg and Shamrock
On the day of the accident, Bourg, then twenty-one years old, had been employed by Shamrock for less than one month. He had previously worked offshore as a roustabout and roughneck. Describing the events of February 11, Bourg testified that Felio delivered the two pallets holding the doors and windows for the generator cover. The video of the accident shown at trial shows the two pallets positioned on the floor of Shamrock’s shop near the entrance. After that first delivery, Bourg participated in a “spur of the moment” verbal job safety analysis with other Shamrock employees to plan for the delivery of the generator cover. This was done as the forklift driven by Felio was traveling up the Shamrock driveway. No one suggested moving the pallets holding the doors and windows for the generator cover out of the way, and Bourg was given no specific direction as to his role in the delivery other than to “be careful.” Bourg laid down multiple 4’ foot by 4 foot timbers near the shop entrance to provide a base upon which Felio could set the generator cover. Bourg chose the. number and placement of the timbers himself. According to Bourg,' when Felio set the generator cover on the timbers, one of the timbers “kicked out” and he attempted to grab it. The next thing Bourg remembered was trying to run.
Bourg did not receive specific safety training when he became a Shamrock | ^employee, and testified -that he “absolutely” did not think he was in any danger before the accident occurred. He admitted that this was the first time, he had ever seen or participated in the delivery of a generator cover. From what he observed that day, Bourg stated, “[I]f the forklift would have had brakes and [Felio] could have stopped from going down that hill, I think he could have stopped [the generator cover] from flipping.”
Himel testified at trial. He admitted that on the morning of the accident, he told someone at Cajun that the generator cover “needed to be delivered” and. to bring it to the Shamrock shop when the paint dried. Although he could not remember who, Himel said he would have' asked Besson, Lovell, or Felio. Contrary to the testimony of Besson and Thibodaux, Himel denied that deliveries between Cajun and Shamrock were scheduled and stated that this particular delivery was not scheduled for February 12. When asked why he requested delivery on February 11, Himel stated, “Because we needed to work on it. We needed to get it ready to go on the system. On to the generator.” He denied .telling Felio that the delivery was needed “pronto,” and stated that he did not have the authority to direct any Cajun employee to perform a job. He acknowledged that the generator cover was the first of its size to be delivered, but he *66 denied the need for a written job safety-analysis.
Himel said he assisted Jeremy Paul Chaisson, the manager in charge of this generator package, with the delivery, because he was in the Shamrock shop when he saw Felio bringing the generator cover. He did not remember whether he, Chais-son, or Bourg placed the timbers, but said that laying a base was standard procedure for receiving deliveries made with a forklift. He explained that the purpose of using the timbers as a base for the delivery was to allow clearance for removal of the forklift forks after the generator cover was set down. He acknowledged that it was a Shamrock employee who chose to place the timbers | uthat day. He said the location of a delivery to Shamrock depended on the amount of free shop space and how much “stuff’ was on the floor. He acknowledged that “stuff’ in Shamrock’s shop was not moved before the generator cover delivery because “we all felt like it was safe.”
Himel guided the forklift diúven by Felio up the Shamrock ramp. After the generator cover was set on the timbers, Himel positioned himself inside the cover and “was directing the forklift operator.” Chaisson and Bourg were standing outside of the cover to Himel’s right, although no one had directed Bourg to stand in a particular spot. According to Himel, as Felio started to back the forklift out, its forks drug on the generator cover, at which point he directed Felio to tilt the forks down. Although Felio complied and there appeared to be sufficient clearance for the forks to be removed, “something kicked the forks up” as he backed up and caused the generator cover to flip over, Himel, himself a certified forklift operator, stated that he saw no reason why Felio could not have safely removed the forklift forks from under the generator cover. He acknowledged that Felio was a Cajun employee and that he did not have authority to tell Felio what to do. He did not know anything about malfunctioning brakes on the Hyster forklift.
Chaisson testified that he knew the generator cover was coming over on February 11, but he did not recall either who requested it or if the delivery was scheduled for the next day. He knew the doors and windows had been delivered earlier on February 11, and he wanted to be present when the generator cover was delivered. Chaisson acknowledged it was standard Shamrock procedure to lay timbers to accept certain deliveries made by forklift, but he did not know which Shamrock employee laid the timbers on February 11. When asked if he thought the timbers were placed in a safe location, Chaisson said “yes.” Chaisson said he helped guide the forklift driven by Felio through the Shamrock shop doors and was standing next to the generator cover when it was set down, with Bourg standing to lifihis right and Himel inside the cover. As Felio attempted to back up the forklift, the generator cover “shifted slightly,” Chaisson tried to hold it in place, and “within a split second, the cover flipped.” Chaisson was not struck by the generator cover because he was standing in one of its doorways when it flipped. He ended up inside the cover once it flipped.
On cross examination, Chaisson admitted that when a delivery was needed Shamrock’s standard procedure was to contact a Cajun project manager or person in charge. He said that Shamrock usually performs a job safety analysis for delivery of large pieces of equipment and, as far as he knew, one was not done for this delivery. He said this was the first delivery of a generator cover of this size. In his opinion, because the forklift was on an incline, the forklift forks scraped as Felio *67 backed up, causing the generator cover to flip. He acknowledged that the timbers were placed such that the forklift could not enter the Shamrock shop and stop on a horizontal surface. He also acknowledged that Shamrock personnel had decided “[w]here to put [the generator cover] and what to put it on.”
Jason Theriot was the manager for Shamrock’s mechanical shop in February 2009. Although he did not see the accident occur, he entered the Shamrock shop immediately after the accident, and saw Bourg’s foot trapped under the generator cover. Theriot helped Himel and Chaisson remove the cover from Bourg’s foot and directed someone to call 911. Theriot also attended the post-accident meeting the next day. At that meeting Shamrock and Cajun employees reviewed the chain of events leading to the accident and ' discussed the precautionary actions necessary to prevent further incidents. They discussed that Felio was a painter and not Cajun’s “usual” forklift operator and that “he had no business being on the [Hyster] forklift because he wasn’t familiarized with the unit.” Theriot said that the forklift’s brakes were discussed and, contrary to the testimony of Besson, Aston, and Thibo-daux, that Cajun personnel “were aware that the unit had h dysfunctional brakes” and that the brakes would be fixed.
As a Shamrock manager dealing with fabrication projects, Theriot’s usual practice was to use the proper chain of command and communicate “manager to manager” when he had specific needs. He was not regularly based at Shamrock’s Houma location but knew that Besson, a Cajun supervisor, was “pretty much our go to guy if we needed anything.” When asked what Himel should have done if he needed something delivered, Theriot said Himel should have informed the Cajun project manager in charge of the project. He said Shamrock routinely used job safety analy-ses to evaluate its jobs, but, as the party making the delivery, Cajun would have been responsible for performing the analysis.
REVIEW OF THE TRIAL COURT’S JNOV
In ruling on the JNOV, the trial court determined that it was “ludicrous” for the jury to have apportioned only 10% fault to Felio and Cajun. The court pointed out that Felio obviously committed “forklift operator error,” and the jury’s 10% allocation of fault was unreasonable, especially in light of testimony of Besson and Aston that Besson could have safely delivered the generator cover up the Shamrock ramp and onto the timbers. The trial court reasoned that Cajun’s assertion that the delivery could have been made safely was essentially an admission that Felio was at fault. The court noted that “the forklift and the operation of that forklift when those tongs tipped the generator cover over, that’s what started the ball rolling.” Based on this reasoning, the trial court reapportioned the fault, assessing 50% fault to Bourg and Shamrock and 50% fault to Felio and Cajun.
We have carefully reviewed the record, including the trial transcript, the JNOV hearing transcript, and the evidence adduced at trial. After reviewing the totality of the evidence, we are compelled to disagree with the trial court’s conclusion that no reasonable juror could conclude that Bourg and Shamrock were | ⅞790% at fault and Felio and Cajun were 10% at fault. The question of whether a particular actor’s conduct falls below the applicable standard of care, and the appropriate allocation of fault when such substandard conduct is found, are distinctly factual inquiries. See Clement v. Frey, 95-1119, 1163 (La.1/16/96), 666 So.2d 607, 610-11; *68 Granger, 145 So.3d at 1087. As to the allocation of fault, the trier of fact is bound to consider the nature of each party’s wrongful conduct and. the, extent of the causal relationship between the conduct and the damages claimed. Watson v. State Farm Fire and Casualty Insurance Company, 469 So.2d 967, 974 (La.1985).
The jury heard conflicting testimony from the witnesses and apparently determined that the conduct of Shamrock and Bourg was significantly more negligent than that of Felio and Cajun and was the main' cause of Bourg’s injuries. Although Himel denied that deliveries were scheduled between Cajun and Shamrock, the testimony of multiple Cajun employees indicated that deliveries requiring the use. of the Hyster forklift were usually planned by supervisors at Cajun and Shamrock, and that this- particular delivery was indeed scheduled for the morning of February. 12. Himel did not consider the generator cover delivery to be a job of great magnitude, but knew that this was the first generator cover of this size to be delivered by Cajun. Himel also knew that Felio was not authorized to use the Hyster forklift to make deliveries, and that he did not have authority to tell Cajun employees what to do. The jury heard about a conversation in which Besson explained to Himel that the delivery would be made on February 12, after Shamrock made sufficient room in its shop to receive the delivery. Although Besson testified that Himel was not upset, Felio testified the reason he “took it upon” himself to deliver the generator cover was because Himel came to the Cajun shop “ranting and raving” that the delivery was needed on February 11. Thus, from the facts and inferences adduced at trial, the jury could reasonably have | ^determined that Himel “started the ball rolling” in this case when he intentionally circumvented the established chain of command at Cajun and, without authorization, told Felio to deliver the generator cover on the afternoon' of February 11.
The jury also heard testimony from which it could have reasonably concluded that Shamrock’s fault encompassed significantly more than Himel’s demand for the generator cover to be delivered early. Hi-mel and Chaisson, Shamrock supervisors, as well as Bourg, were directly involved in how the delivery took place. Chaisson acknowledged that job safety analyses were usually conducted for large deliveries arid admitted that- no such analysis was done for this delivery. Himel acknowledged that the location chosen for a Shamrock delivery depended on how much “stuff’ was located on the shop floor, and he knew that the timbers had been laid right at the door of the Shamrock shop entrance, which , required that the forklift be at a slant as it set the generator cover down. Yet, neither Himel nor Chaisson moved the two pallets holding the windows and doors for the generator cover before Felio made the delivery of the generator cover because they saw nothing unsafe about the delivery.' Nor did they instruct Bourg on where to place the timbers. According to Boúrg, he alone chose the number and placement of the timbers; and, Chaisson; admitted that the timbers were placed such that the Hyster forklift could not enter the shop and stop on a level surface.' The jury saw the video of the actual accident and reasonably could have concluded that, had the pallets containing the doors and -windows for the generator cover been moved further into Shamrock’^ shop as Besson and Himel had discussed, then the timbers could have been laid further inside of the shop, allowing Felio to drive the Hyster forklift up the ramp, into the shop, and onto a level surface before setting down the generator cover. Further, Himel and Chaisson actually guided the forklift driven by Felio up the ramp, *69 while Bourg acted as a spotter. Himel gave 119Felio a direct instruction on how to operate the Hyster forklift when the forks began to drag. And, without sensing any danger, Bourg attempted to reposition one of the timbers under the generator cover when the timber became dislodged. This unfortunate chain of events which led to the accident demonstrates that Shamrock, through the decisions and actions of its employees, was actively involved in every step of the substandard delivery of the generator cover.
The jury also heard testimony regarding the fault of Felio and Cajun. Although certified as • a forklift operator who had previously operated the Hyster forklift, Felio did not have Cajun’s authority to use, nor had he ever before used, the Hyster forklift to make deliveries to Shamrock, particularly a large generator cover such as was involved in this accident. Fe-lio knew he was not required to take directions from Shamrock managers, including Himel. He testified that the Hyster forklift had “no brakes” and Cajun management knew this; 'and, Theriot testified that at the post-accident meeting, Cajun supervisors admitted the forklift had “dysfunctional” brakes. However, Cajun supervisors explained that the forklift’s brakes were designed with a built-in delay, denied receiving complaints from anyone about the brakes, and denied that this issue was discussed at the meeting. In contrast to the actual events leading to the accident, Cajun supervisors testified that had the delivery been made the next morning as planned, an authorized and experienced Cajun forklift operator would have made the delivery, the delivery could have been made with no problem, only Cajun employees would have accomplished the delivery, and no Shamrock employees would have participated.
There is sufficient evidence from which a reasonable and fair-minded juror could have determined that the conduct of Bourg and Shamrock was the primary cause of Bourg’s accident and that the conduct of Cajun and Felio was much less causally related. The evidence reasonably supports that Himel’s demand for early | ¡^delivery, Shamrock’s lack of preparation for the delivery of an item of this size, Shamrock’s failure -to recognize the danger of the rushed delivery, and the significant involvement of Himel, Chaisson, and Bourg in accepting the actual delivery had more of a causal connection to the accident than did any dysfunction of the Hyster forklift’s brakes or Felio’s unauthorized use and improper operation of the forklift.
Under the “rigorous standard” applicable to a JNOV, we resolve all reasonable inferences and factual questions in favor of Felio and Cajun. As such, our review of the record indicates the trial court erred in focusing primarily on the causal effect of Felio’s conduct, in failing to recognize the overwhelming causal effect of Shamrock employees, and in reapportioning fault on that basis. Accordingly, we reverse the trial court’s grant of -the JNOV -on the allocation of fault and reinstate the jury’s verdict on this issue.[7]
GENERAL DAMAGES
The jury awarded Bourg a total of $250,000.00 in general damages, categorized as $83,333.33 for past, present,, and future physical pain and suffering; *70 $83,333.33 for past, present, and future mental pain and suffering; and $83,333.33 for loss of enjoyment of life. In their answers to the appeal, Bourg and LOCA challenge the jury’s $250,000.00 general damage award and contend that $2,000,000.00 is the least amount that would fairly compensate Bourg for the physical and mental pain and suffering and loss of enjoyment of life associated with his permanent injuries.
It is well-settled that a jury is given great discretion in its assessment of quantum, both general and special damages. La. Civ.Code art. 2324.1; Guillory v. Lee, 09-0075 (La.6/26/09), 16 So.3d 1104, 1116. An appellate court reviews the amount awarded by the jury under the abuse of discretion standard, meaning that it may disturb a damage award and resort to a review of prior similar awards only after an articulated analysis of the facts reveals an abuse of discretion. See Bouquet v. Wal-Mart Stores, Inc., 08-0309 (La.4/4/08), 979 So.2d 456, 459.
General damages are intended to compensate an injured plaintiff for mental or physical pain and suffering, inconvenience, loss of gratification or intellectual or physical enjoyment, or other losses of lifestyle. See Thongsavanh v. Schexnayder, 09-1462 (La.App. 1 Cir. 5/7/10), 40 So.3d 989, 1001, writ denied, 10-1295 (La.9/24/10), 45 So.3d 1074. They are inherently speculative in nature and cannot be fixed with mathematical certainty. Miller v. LAMMICO, 07-1352 (La.1/16/08), 973 So.2d 693, 711. Since the jury is in the best position to evaluate witness credibility and see the evidence firsthand, it is afforded much discretion in independently assessing the facts and rendering an award. Id.
On appeal, the role of the appellate court is to review the exercise of discretion by the jury, not to decide what it considers to be an appropriate award. Youn v. Maritime Overseas Corp., 623 So.2d 1257, 1260 (La.1993), cert. denied, 510 U.S. 1114, 114 S.Ct. 1059, 127 L.Ed.2d 379 (1994). It is only when the award is, in either direction, beyond that which a reasonable trier of fact could assess for the effects of the particular injury to the particular plaintiff under the particular circumstances that the appellate court should increase or reduce the award. Youn, 623 So.2d at 1261. Only after it is determined that there has been an abuse of discretion is a resort to prior awards appropriate, and then only to determine the highest or lowest point of an award within that discretion. Coco v. Winston Industries, Inc., 341 So.2d 332, 335 (La.1976); Aymami v. St. Tammany Parish Hospital Service District No. 1, 13-1034 (La.App. 1 Cir. 5/7/14), 145 So.3d 439, 448. In reviewing a general damages award a court does not review a particular l^item in isolation; rather, the entire general damages award is reviewed for abuse of discretion. Aymami, 145 So.3d at 448.
The medical evidence establishes that Bourg sustained a severe crush-type injury to his left foot. Dr. Christopher Cenac, Jr., an orthopedic surgeon, performed emergency surgery on Bourg’s foot on the day after the accident. Dr. Cenac inserted multiple pins to hold the metatarsal bones together, and these pins, exposed through the ends of all toes on Bourg’s left foot, remained in place for almost six weeks. Bourg was homebound for the first few months after the accident and received most of his care from his mother, Dawn Fournier, a registered nurse. Bourg’s post-operative care included several hyper-baric treatments to treat dry gangrene that had set in on three of his toes. These treatments, along with debridement of dead tissue, achieved a successful result, as Bourg was able to avoid amputation of *71 those toes. After removing the pins, Dr. Cenac put Bourg in a “walking boot,” but Bourg testified that he could not walk and continued to have tremendous pain.
In April 2009, Dr. Cenac discovered that three of Bourg’s toes had not healed properly, so he referred Bourg to another orthopedic surgeon, Dr. Michael Blanchard, for consideration of additional surgery. Dr. Cenac also noted that Bourg began to show signs of reflex sympathetic dystrophy (RSD), also known as complex regional pain syndrome, a condition characterized by chronic, intense, burning pain, swelling, and hypersensitivity to touch.[8] From June through October 2009, Bourg underwent physical therapy. Bourg testified that he continued to have problems with pain and swelling.
| gjDr. Blanchard agreed with Dr. Cenac that Bourg needed additional surgery and had developed RSD. In May 2010, Dr. Blanchard performed the second surgery, grafting a bone from Bourg’s knee and inserting plates and screws in his foot to hold the bones together while they healed. In August 2010, Dr. Blanchard determined that Bourg’s fractures had healed, albeit at a slight angle, leaving his left foot anatomi- • cally abnormal; however, from an orthopedic standpoint, Dr. Blanchard thought Bourg could return to sedentary work. Bourg continued to see Dr. Blanchard through October 2010, at which time Dr. Blanchard noted that Bourg was still in pain and exhibiting continuing symptoms of RSD.
During his treatment of Bourg, Dr. Blanchard also referred him to Dr. Michael Burdine, a pain management specialist, for treatment of Bourg’s RSD. Dr. Burdine agreed with the RSD diagnosis and, over the course of several months, prescribed various medications to Bourg for pain, insomnia, and depression. Dr. Burdine also administered a series of lumbar spinal injections to Bourg that provided short term relief of his pain. However, in November 2011, Dr. Burdine discontinued treatment of Bourg because he failed a drug screen. Bourg’s drug screen revealed the presence of drugs Dr. Burdine had not prescribed, the absence of drugs Dr. Burdine had prescribed, and the presence of marijuana.
Bourg then began seeing Dr. Chad Do-mangue, a second pain management physician, who agreed that Bourg had RSD, which he referred to as “complex regional pain syndrome.” Dr. Domangue suggested the implantation of a spinal cord stimulator, which he explained is basically designed to intercept a pain' signal before it reaches the brain. At his video deposition, which was shown to the jury, Dr. Do-mangue explained that a spinal cord stimulator could realistically provide a patient with sixty to seventy percent pain reduction, but acknowledged that he did not know what kind of result Bourg would have if he were to undergo the procedure. According to Dr. Domangue, as of a few weeks before trial, Bourg was | ^totally and permanently disabled from any type of work. He stated that Bourg’s RSD was incurable and would likely worsen, even with the spinal cord stimulation.
Barney Hegwood, a vocational rehabili'tation counselor who performed a vocational assessment of Bourg, also testified at *72 trial. He believed that Bourg was not a candidate to return to work due to his probable lack of success in any schooling, his pain, his reaction time, his concentration, his decision making, as well as the bad days and good days associated with his condition. Hegwood did acknowledge, however, his opinion might change if Bourg were to undergo the recommended spinal cord stimulation with success.
Bourg testified that he was in excruciating pain immediately after the accident and during his hospital stay following the first surgery. He'recounted trying to adjust to the walking boot, which was difficult because of continuous pain and swelling. He also discussed his constant change of medications, his development of RSD, his total dependence on his mother for months after the accident, that he still experiences pain after he tries to do any activity, and his fear of his future with the injury. He. admitted to. smoking marijuana during his treatment with Drs. Burdine and Domangue. He hoped that he could get the spinal cord stimulator, and when asked if he planned to return to employment, Bourg stated that he was. going to do “everything I can do to get back to normal.” As of the time of trial, he testified that his left foot was,still in “a substantial amount of pain” and often swelled. He was unable to put his full weight on the foot, was unable to bend his toes, the bottom of his foot was very sensitive, and he walked with a limp.
Fournier, Bourg’s mother, testified that her son’s pain has “affected every single facet of his life” and it seemed to be getting worse. According to Fournier, Bourg’s personality has gone from upbeat to depressed, short tempered, angry, and emotional. Fournier stated that - Bourg tries to see friends, goes fishing and |2Khunting, can stoop and bend, takes care of chores around the house, can now drive, and has a girlfriend. She noted, however, that when he tries to do things, “he knows he’s going to pay for it” because his foot will swell.
Two other witnesses testified about Bourg’s condition before and after the accident. His grandfather, Larry Ward, testified that before the accident Bourg was amiable, enthusiastic, enjoyed life, was humorous, and overall, very likable. After the accident, Ward described his grandson as “more fragile,” afraid, particularly of the future, and as having lost his confidence. Ward noted that Bourg’s “bad days” involye lots of pain, and when he tries to do things, he gets tired and has to rest his foot “or it will swell up like a balloon.” Ryan Chaisson, Bourg’s childhood friend, described him as an outgoing, energetic, upbeat, person who loved the outdoors before the accident. After the accident, Chaisson noted that Bourg is more ill-tempered and is unable to do things they used to do, like fishing. Chais-son testified that Bourg walks with a limp, his left foot is sometimes obviously swollen, and he tires easily.
.. The defendants presented a surveillance video of Bourg along with the testimony of Dr. Field Ogden, an orthopedic surgeon who performed an independent medical examination on Bourg.[9] While Dr. Ogden agreed with the diagnosis of RSD, he also confirmed that the condition can be exaggerated or magnified by a patient because there is no objective test to determine if a person has the condition or the severity of the condition. ' Consequently, any diagnosis.is dependent upon the patient’s, veracity and the- accuracy of the information he *73 provides to the physician. During his testimony, Dr. Ogden reviewed the surveillance video of Bourg as it was shown to the jury. According to Dr. Ogden, the video depicted Bourg walking almost normally, which stood in contrast to the | ^significant limp Bourg exhibited while he was at Dr. Ogden’s office. Dr. Ogden characterized Bourg’s gait on the video as “substantially different than it was in my office,” which Dr. Ogden described as being “more exaggerated” compared to the video. Dr. Ogden also testified that, in his opinion, Bourg was able to return to work or school.
While the evidence undoubtedly establishes that Bourg sustained a serious injury to his foot, the jury was confronted with conflicting evidence concerning the severity of Bourg’s.residual pain and limitations. Bourg, his treating physicians, as well as other fact witnesses offered testimony indicating that Bourg continued to have significant pain three years after the'accident that limited his ability to return to work or school and adversely affected his lifestyle and personality. On the other hand, the jury also watched a surveillance video of Bourg and heard from Dr. Ogden, who explained the subjective nature of RSD and described Bourg as “walking almost imperceptibly normally” in the surveillance video, distinctly different from the “more exaggerated” gait Bourg demonstrated at Dr. Ogden’s office. Dr. Ogden also testified that Bourg was able to return to work or school. This evidence suggested that-Bourg was overstating the degree of his residual pain and limitations, a point that was emphasized in closing arguments by the defendants’ attorney, who, in reliance upon Dr. Ogden’s testimony and the video, argued that Bourg was exaggerating his symptoms. The defendants’ counsel suggested that an appropriate general damage award should be $250,000.00,. and the jury awarded precisely that amount.
Although the plaintiff presented testimony from more witnesses on the damage issue, the jury was apparently impressed by Dr. Ogden’s testimony and the surveillance video. The number of witnesses is not a decisive factor as witnesses are weighed, not counted. Harris v. Soulier, 13-1245 (La.App. 1 Cir. 5/2/14), 2014 WL 3557481. Where there are two permissible views of the evidence, the ls7factfinder’s choice between them cannot be manifestly erroneous. Adams v. Rhodia, Inc., 07-2110 (La.5/21/08), 983 So.2d 798, 806. Further, where the findings are based on. determinations regarding the credibility of witnesses, the manifest error standard demands great deference to the findings of fact. Adams, 983 So.2d at 806-07. Indeed, where the factfinder’s determination is based on its decision to credit the testimony of one of two or more witnesses, that finding can virtually never be manifestly erroneous. Adams, 983 So.2d at 807. Considering the entirety of the evidence, we cannot say the jury abused its much discretion in awarding Bourg the sum of $250,000.00 for general damages.
COSTS
 On appeal, all parties challenge the trial court’s assessment of costs in this case. In the January 7, 2013 judgment, the trial court assessed 70% of costs to the defendants, 10% to LOCA to be paid to Bourg, and 20% to Bourg.
While the general rule is that the party’ cast in judgment should be assessed with court costs, the trial court may assess costs in any equitable manner and against any party in any proportion it deems equitable, even against the party prevailing on the merits. See La.Code Civ. Pro. art. 1920; Brown v. Mathew, 13-1974 (La.App. 1 Cir. 12/30/14), 2014 WL 7455038, at * 13; Anglin v. Anglin, 09- *74 0844 (La.App. 1 Cir. 12/16/09), 30 So.3d 746, 753-54. Upon review, an appellate court will not disturb the trial court’s fixing of costs absent an abuse of the sound discretion afforded the trial court. Gauthier v. Wilson, 04-2527 (La.App. 1 Cir. 11/4/05), 927 So.2d 383, 390, writ denied, 05-2402 (La.3/31/06), 925 So.2d 1258.
The trial court did not assess costs until after the JNOV was granted. At that time, the trial court allocated costs disproportionately to its allocation of fault. That cost allocation was also disproportionate to the original allocation of fault by the jury, which fault allocation has been reinstated on appeal. We do not find the |2sCOst allocation to be so disproportionate as to constitute an abuse of the discretion afforded the trial court. See Brown (although defendant was found free from fault, trial court did not abuse its discretion in refusing to allocate defendant’s expert witness fee to the plaintiff); Townes v. Liberty Mutual Insurance Company, 09-2110 (La.App. 1 Cir. 5/7/10), 41 So.3d 520, 531 (although plaintiff got a zero verdict, trial court did not abuse its discretion in ordering each party to bear their own costs); Starr v. State ex rel. Department of Transportation and Development, 46,226 (La.App. 2 Cir. 6/17/11), 70 So.3d 128, 144, writs denied, 11-1835, 11-1952, 11-1625 (La.10/21/11), 73 So.3d 386, 387, 388 (trial court did not abuse its discretion in allocating 100% of costs to a defendant found only 24% at fault); Davis v. State, DOTD, 94-308 (La.App. 3 Cir. 12/7/94), 647 So.2d 552, 556, writ denied, 95-0034 (La.1/27/95), 649 So.2d 382 (no abuse of discretion in allocating 100% of costs to defendant found 40% at fault). This assignment of error is without merit.
CONCLUSION
We find the jury’s verdict as to the assessment of fault was reasonably supported by the evidence presented in this case. We further find no abuse of discretion in the jury’s general damage award of $250,000.00. Accordingly, the January 7, 2013 judgment notwithstanding the verdict is reversed, in part, as to the assessment of fault. The jury’s verdict, together with the trial court’s September 20, 2012 judgment rendered in accordance with the jury’s verdict, is reinstated. In all other respects, the January 7, 2013 judgment notwithstanding the verdict is affirmed. Costs of the appeal are assessed equally to the parties.
JUDGMENT NOTWITHSTANDING THE VERDICT REVERSED, IN PART, AS TO ASSESSMENT OF FAULT; ORIGINAL JUDGMENT DATED SEPTEMBER 20, 2012, REINSTATED; JUDGMENT NOTWITHSTANDING THE VERDICT AFFIRMED IN ALL OTHER RESPECTS.
McDONALD, J., agrees in part and dissents in part with reasons.

. The September 20, 2012 judgment set forth the damages as follows: physical pain and suffering (past, present, and future)— $83,333.33; mental pain and suffering (past, present, and future) — $83,333.33; loss of enjoyment of life — $83,333.33; past lost wages — $72,000.00; future lost wages (diminished earning capacity) — $483,752.50; past medical expenses — $139,712.23; and future medical expenses — $991,777.50.

. On June 4, 2013, after the appeal was taken; the trial court signed a consent judgment in *61 which Bourg and LOCA agreed to the amounts owed to LOCA.

. The January 7, 2013 judgment also denied defendants’ motion challenging the timeliness of Bourg’s motion for JNOV and new trial.

. On appeal, the defendants also challenge the trial court's June 26, 2012 judgment, denying their motion for summary judgment, in which they sought a ruling that Bourg’s sole and exclusive remedy was in workers’ compensation. We have reviewed the parties' respective positions on this issue, find no merit in the .defendants' assignment of error, and determine that the trial court correctly denied the summary judgment.

. The purpose of a job safety analysis was to look at a job from a safety standpoint before performing it to identify potential hazards.

. Cajun’s stop card program was a behavior based safety program whereby employees submitted cards documenting safe and unsafe practices of co-employees. Periodically, a designated team of Cajun employees would review submitted stop cards and take appropriate action, if necessary.

. In his answer to the appeal, Bourg assigns error to the allocation of fault by both the trial court and the jury, arguing that 100% fault should be assessed to Felio and Cajun. For the same reasons that we reinstate the jury’s verdict regarding the allocation of fault, we find no merit in Bourg’s assignments of errors. Likewise, we find no merit in LOCA’s assignment of error regarding the allocation of fault.

. The Louisiana Supreme Court has cited the following medical definition for RSD: "Reflex Sympathetic Dystrophy (also known as Complex Regional Pain Syndrome) is chronic neu-ropathic pain that follows soft tissue or bone injury or nerve injury and persists out of proportion in intensity and duration to the original tissue damage. The Merck Manual 170 (18th ed. 2006)." Iberia Medical Center v. Ward, 09-2705 (La. 11/30/10), 53 So.3d 421, 425 n. 3.

. Initially, the record lodged with this court on appeal contained an incomplete transcript of the trial testimony of Dr. Ogden; however, on December 5, 2014, the record was supplemented to include a complete transcript of the testimony.